No. 24-14097

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

AUGUSTUS C. ROMAIN, JR., JESSE NEVEL,
PENNY JOANNE HESS, and OMALI YESHITELA,

Defendants-Appellants.

## JOINT OPENING BRIEF OF APPELLANTS OMALI YESHITELA, PENNY JOANNE HESS, AND JESSE NEVEL

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:22-cr-00259-WFJ-AEP

Leonard C. Goodman
Angela J. Reaney
Goodman Law Office LLC
53 W. Jackson Blvd, Suite 1650
Chicago, IL 60604
(312) 986-1984
Attorneys for Penny Hess

Mutaqee Akbar, Esq.
Akbar Thomas
619 N. Copeland St.
Tallahassee, FL 32304
(850) 383-0000
Attorney for Jesse Nevel

Ade Griffin, Esq.
Griffin Inskeep Law LLC
224 Datura St.
Suite 900
West Palm Beach, FL 33401
(561) 320-6006
Attorney for Omali Yeshitela

No. 24-14097

*United States of America v. Augustus C. Romain et al.*

**CERTIFICATE OF INTERESTED PERSONS**

The persons listed below have an interest in the outcome of this case:

Akbar, Mutaqee - Attorney

Asokan, Risha - Assistant United States Attorney

Chang, Emily - Assistant United States Attorney

Goedman, Menno - DOJ Trial Attorney

Goodman, Leonard - Attorney

Griffin, Ade - Attorney

Hess, Penny Joanne

Ionov, Aleksandr Viktorovich

Jung, The Honorable William

Lambert, George - Attorney

Krigsman, Cherie - AUSA

Marcet, Daniel – AUSA

Nevel, Jesse

O'Brien, Mark - Attorney

Popov, Yegor Sergeyevich

No. 24-14097

*United States of America v. Augustus C. Romain et al.*

**CERTIFICATE OF INTERESTED PERSONS**

Porcelli, The Honorable Anthony

Reaney, Angela - Attorney

Romain, Augustus C.

Sukhodolov, Aleksey Borisovich

Sumner, Demetrius – DOJ Trial Attorney

Yeshitela, Omali

I hereby certify pursuant to 11th Circuit Rule 26.1-3(b) that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

**STATEMENT REGARDING ORAL ARGUMENT**

Defendants-Appellants Omali Yeshitela, Penny Joanne Hess, and Jesse Nevel respectfully request oral argument. This case involves complex legal questions including an issue of first impression—whether the indictment of activists for political speech critical of the government violates the First Amendment to the Constitution, where the indictment alleges that the defendants were speaking as agents of Russia.

This appeal questions whether innocent conduct can be criminalized under 18 U.S.C. § 951 even though Supreme Court precedent provides that there must be knowledge of registration requirements where conduct is otherwise innocent. It also questions whether the Supreme Court's holdings in *Rehaif v. United States,* 588 U.S. 225 (2019), and *Ruan v. United States*, 597 U.S. 450 (2022), that *mens rea* must be read into all elements to separate innocent from wrongful conduct, have abrogated the Eleventh Circuit case of *United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010), which found that one need not have knowledge of § 951's registration requirement. It then questions whether *Duran* is inconsistent with the Eleventh Circuit case of *United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023), which found that a conspiracy requires one to know the fact that makes their conduct illegal.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS..........................................................1

STATEMENT REGARDING ORAL ARGUMENT................................................. i

TABLE OF CITATIONS........................................................................ iv

STATEMENT REGARDING ADOPTION........................................................... vi

JURISDICTIONAL STATEMENT ................................................................. vii

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE....................................................................2

   I.      Course of Proceedings ................................................................2

   II.     Statement of the Facts ................................................................4

   III.    Standards of Review...................................................................15

SUMMARY OF THE ARGUMENT ....................................................................17

ARGUMENT ...................................................................................18

   I.    THE LOWER COURT'S FINDING, THAT LAWFUL POLITICAL SPEECH LOSES ITS FIRST AMENDMENT PROTECTIONS WHEN THE SPEAKER IS ALLEGED TO BE A RUSSIAN AGENT, SHOULD BE REVERSED…………………………………………………………………..18

   II.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF A CONSPIRACY AS IT PRESENTED NO EVIDENCE, AS CONCEDED BY THE GOVERNMENT'S CASE AGENTS, THAT THE APSP DEFENDANTS (1) ACTED OR AGREED TO ACT UNDER THE DIRECTION OR CONTROL OF IONOV OR THE AGMR, OR (2) KNEW OF THE REGISTRATION REQUIREMENT, ESSENTIAL ELEMENTS OF A CONSPIRACY..........................................................................25

       A. The government's case agents unambiguously conceded that there was no evidence that the APSP defendants ever acted or agreed to act under the direction or control of Ionov or the AGMR. ..................................25

B. The only evidence of a connection to the Russian government came from inadmissible hearsay. ..............................................................30

III. THE JURY WAS MISLED TO BELIEVE THAT IT COULD CONVICT THE DEFENDANTS ON THE CONSPIRACY CHARGE DESPITE THE ABSENCE OF EVIDENCE AS TO THE UNDERLYING CRIME. ...........36

A. The lower court's refusal to instruct the jury on the elements of the underlying crime, coupled with the government's misleading closing argument, requires reversal. ................................................................36

B. The lower court abused its discretion in refusing to give a limiting instruction to prevent the jury from considering evidence introduced in Defendant Romain's case against the APSP defendants. ....................38

C. The government committed misconduct by falsely accusing the APSP defendants of planning to build "a doxing website with the Russians." .........................................................................................................41

CONCLUSION ........................................................................................................43

CERTIFICATE OF COMPLIANCE ......................................................................44

CERTIFICATE OF SERVICE ...............................................................................45

# TABLE OF CITATIONS

## CASES

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)....................................................20

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................18

*Cohen v. California*, 403 U.S. 15 (1971)......................................................22

*De Jonge v. Oregon*, 299 U.S. 353 (1937) ............................................ 19, 20, 21

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)................................................19

*Herndon v. Lowry*, 301 U.S. 242 (1937) .....................................................19

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ........................................20

*In re Winship*, 397 U.S. 358 (1970)............................................................25

*Jones v. United States*, 526 U.S. 227 (1999)...............................................30

*Lambert v. California*, 355 U.S. 225 (1957) ................................................34

*Meyer v. Grant*, 486 U. S. 414 (1988) ...............................................  18, 19

*NAACP v. Button*, 371 U.S. 415 (1963)......................................................18

*Neder v. United States*, 527 U.S. 1 (1999) .................................................25

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)......................................22

*Rehaif v. United States*, 588 U.S. 225 (2019) ..................................... i, 33, 34

*Roth v. United States*, 354 U.S. 476 (1957).................................................20

*Ruan v. United States*, 597 U.S. 450 (2022) ..................................... i, 16, 35

*United States v. Arbane*, 446 F.3d 1223 (11th Cir. 2006) .................................31

*United States v. Booker*, No. 23-14041,
       2025 U.S. App. LEXIS 10482 (11th Cir. Apr. 30, 2025)..............................16

*United States v. Dean*, 635 F.3d 1200 (11th Cir. 2011) ...................................15

United States v. Dumeisi, 424 F.3d 566 (7th Cir. 2005) ............................... 23, 24

*United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010)........................... i, 33, 34

*United States v. Gonzalez*, 122 F.3d 1383 (11th Cir. 1997) ...............................42

*United States v. Gonzalez*, 975 F.2d 1514 (11th Cir. 1992) ...............................40

*United States v. Hoskins*, 44 F.4th 140 (2d Cir. 2022).....................................27

*United States v. McDonald*, 935 F.2d 1212 (11th Cir. 1991)................................31

*United States v. O'Steen*, 133 F.4th 1200 (11th Cir. 2025)................................16

*United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) ........................... i, 16, 37

*United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011)................................16

*United States v. Wheeler*, 16 F.4th 805 (11th Cir. 2021)..................................38

## STATUTES

18 U.S.C. § 371 ..............................................................................2, 15

18 U.S.C. § 3742 ................................................................................ vi

28 U.S.C. § 1291 ............................................................................... vi

## OTHER AUTHORITIES

Non-governmental Organizations (NGOs) in the United States, U.S. Dep't of State
(Jan. 20, 2021), https://www.state.gov/non-governmental-organizations-ngos-in-
the-united-states/..........................................................................34

*OmaliTaughtMe Sunday Study*,
https://www.youtube.com/live/m5T00oNC4XE?feature=share&t=105
(Feb. 27, 2022)...........................................................................13

*The Working Platform of the African People's Socialist Party*, African People's
Socialist Party, https://apspuhuru.org/about/platform/ (adopted Sept. 23, 1979) ..2

*Ukraine, Russia, EU, U.S. and the crisis of imperialism*, The Burning Spear, Apr.
20, 2014, https://theburningspear.com/1279/ ......................................13

## RULES

11th Cir. R. 28-1(f).......................................................................... vi

Fed. R. App. 28(i)............................................................................ vi

Fed. R. Evid. 801(d)(2)(E) .................................................................30

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................. passim

U.S. Const. amend. V .......................................................................32

## STATEMENT REGARDING ADOPTION

Pursuant to Fed. R. App. 28(i) and 11th Cir. R. 28-1(f), Defendants-Appellants Omali Yeshitela, Penny Hess, and Jesse Nevel are filing one joint brief and each adopts in full the others' briefs. 11th Cir. R. 28-1(a), (b), (c), (d), (e), (f), (g), (m) and (n)

# JURISDICTIONAL STATEMENT

This is a direct appeal from amended final judgments imposed by the United States District Court for the Middle District of Florida, Tampa Division, entered on December 19, 2024. ECF Nos. 371, 370, 369.[1]

Yeshitela timely filed a notice of appeal on December 26, 2024. ECF No. 379. Hess timely filed a notice of appeal on December 21, 2024. ECF No. 375. Nevel timely filed a notice of appeal on December 18, 2024. ECF No. 367. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

---

[1] "ECF No." refers to docket entries in the United States District Court for the Middle District of Florida, Case Number 8:22-cr-00259-WFJ-AEP. "App. ECF No." refers to docket entries before this Court.

# STATEMENT OF THE ISSUES

1. Whether protected political speech loses its First Amendment protection where the government alleges that the political expression was done at the behest of a foreign government?

2. Whether the government presented sufficient evidence of a conspiracy to act as unregistered foreign agents under 18 U.S.C. § 951 where its case agents admitted that there was (a) no evidence that the defendants acted or agreed to act under a foreign government's or official's direction or control, and (b) no evidence that the defendants had knowledge of § 951's registration requirement—the element that separates innocent from wrongful conduct?

3. Whether the refusal to instruct the jury on the elements of the substantive § 951 offense in the conspiracy jury instruction, coupled with the government's misleading closing argument, require reversal?

4. Whether the lower court abused its discretion when it refused to give a limiting instruction to prevent the jury from considering defendant Romain's conduct that occurred years after defendants Yeshitela, Hess, and Nevel had severed ties with him?

5. Whether the government committed misconduct when it falsely accused the APSP defendants of planning to build "a doxing website with the Russians"?

## STATEMENT OF THE CASE

### I.    Course of Proceedings

Defendants-Appellants Omali Yeshitela, Penny Hess and Jesse Nevel (collectively "the APSP defendants") are associated with the African People's Socialist Party ("APSP") (sometimes referred to as the "Uhuru Movement"), an activist and community group founded in 1972 by Yeshitela. Yeshitela is the chairman of the APSP. Hess is the chairperson of the APSP's African People's Solidarity Committee. Jesse Nevel is the chairperson of the APSP's Uhuru Solidarity Movement, the mass organization of the African People's Solidarity Committee. The APSP supports the rights of African people throughout the world to be free from colonialism and exploitation.[2]

In July 2022, FBI SWAT teams raided APSP offices in St. Petersburg, Florida, and St. Louis, Missouri, and the private homes of the APSP defendants, seizing documents, computer hard drives, and numerous other items. In April 2023, a superseding indictment was returned, charging the APSP defendants with acting in the United States as agents of the Russian Government without prior notification to the Attorney General, in violation of 18 U.S.C. § 95l(a), and with conspiracy to act as unregistered Russian agents, in violation of 18 U.S.C. § 371.

---

[2] *The Working Platform of the African People's Socialist Party*, African People's Socialist Party, https://apspuhuru.org/about/platform/ (adopted Sept. 23, 1979).

The indictment alleges that in 2015 the APSP defendants "entered into partnership" with a Russian national tied to the Russian government (Alexander Ionov), "to publish pro-Russian propaganda, as well as other information designed to cause dissension in the United States and to promote secessionist ideologies." Superseding Indictment ("SI") 1-2, ECF No. 12. The indictment further alleges that the APSP defendants disseminated "Russian propaganda and disinformation" through published articles, public speeches, and political activity. *Id.* at 12.

The APSP defendants moved to dismiss the superseding indictment on grounds that it targets political speech in violation of the First Amendment to the United States Constitution. Mot. to Dismiss, ECF No. 107. The district court denied the motion, adopting the Magistrate Judge's 21-page Report and Recommendation. Order, ECF No. 222.

The case proceeded to jury trial in September 2024, after which the jury found the APSP not guilty of acting in the United States as unregistered agents of Russia, and guilty of conspiracy to act as unregistered Russian agents. The district court denied motions for judgment of acquittal and for new trial. Mot. for J. of Acquittal, ECF No. 279; Mot. for New Trial, ECF No. 305; Order, ECF No. 329.

On December 16, 2024, the district court sentenced each of the APSP defendants to 36 months' probation. Orders, ECF Nos. 352-54. This appeal follows. The APSP defendants are not incarcerated.

## II.  Statement of the Facts

### a.  Motion to Dismiss based on the First Amendment

The APSP defendants appeal the denial of their Motion to Dismiss. Mot. to Dismiss, ECF No. 107. It is undisputed that the superseding indictment targets political speech. The Overt Acts relating to the APSP defendants all involve their expressions of political beliefs through published articles, public speeches and political activity. SI 14-19, 23-25, 28-30, ECF No. 12. The lower court found that speech "done at the alleged direction of a foreign government" rises to the level of "acts" and loses First Amendment protections. Order 9, ECF No. 157.

### b.  The Jury Trial.

The government called no witness who had any direct knowledge of the defendants' activities although defendants have had a public presence in St. Petersburg, Florida, for more than fifty years, organizing rallies, classes, community meetings, and community events. Tr. (9/9/24 AM) 33, ECF No. 395. Rather, the government presented a "paper" case, built entirely on documents and electronic files seized from the defendants' homes and offices or electronically stored in cloud accounts.

#### i.  Documents and electronic files introduced by the government.

Three FBI agents were called to introduce and interpret the paper evidence and electronic files. Agent Iry Drupp testified that on May 18, 2015, Yeshitela

received an invitation to attend and speak at a conference in Moscow sponsored by the Anti-Globalization Movement of Russia ("AGMR"). Tr. (9/4/24 AM) 99, ECF No. 392. Yeshitela accepted the invitation and discussed with his colleagues the goals for the trip, which included connecting with anti-colonialists in other countries, spreading the APSP message, and accessing international media. *Id.* at 96-97. The government introduced photos of Yeshitela in Russia with Ionov, AGMR's president. *Id.* at 101.

Upon return from Moscow, the APSP defendants continued to communicate with Ionov and his assistants. *Id.* at 103. In July, Ionov donated $500 to the Uhuru Solidarity Movement, a not-for-profit that supports APSP's activism. *Id.* at 102. During the seven years of the alleged conspiracy, Ionov contributed $1,500 to the APSP, plus another $7,000 sent in 2016 to reimburse the APSP for some expenditures associated with the encampment tour. Tr. (9/9/24 PM) 201, ECF No. 424. The APSP is a not-for-profit and is funded by donations from its supporters. *Id.* at 187.

In August 2015, the APSP posted a petition to the United Nations charging the U.S. government with crimes against African people and demanding reparations. The indictment alleged that Ionov "direct[ed] Hess" to draft this petition but no evidence supported this charge. SI 14, ECF No. 12; Tr. (9/9/24 PM) 122, ECF No. 424 (FBI agent testifies that Hess was not directed to write a petition.).

Around that time, Yeshitela accepted a second invitation from the AGMR to travel to Moscow and participate in a "Dialogue of Nations" conference. Tr. (9/9/24 PM) 135, ECF No. 424. The government again introduced photographs of Yeshitela in Moscow in the company of Ionov. Tr. (9/4/24 AM) 123-25, ECF No. 392. The government also introduced APSP internal documents and emails in which the following comments were made about the AGMR:

> In attending the AGM conference, we did so recognizing that the Anti-Globalization Movement of Russia, which more than likely represents a method by which the Russian Government is engaging the U.S. and Europe in serious struggle, is carrying out its own agenda, to utilize forces inside the U.S. to sew [sic] division inside the U.S. Likewise, our party is clear that we also have our own agenda, to place the question of African self-determination on the world's agenda and to win international allies for our National Liberation Struggle.

*Id.* at 133-34.

In early January 2016, Hess discussed with Ionov's assistant a plan to organize a four-city tour to highlight the issues raised in the petition to the United Nations. *Id.* at 149. Ionov suggested a tent vigil and offered to cover related expenses. Hess sent Ionov a budget of $12,000. *Id.* at 149-50. However, Ionov did not send the funds as promised, causing a financial crisis for the defendants who were forced to borrow funds to pay for tents, sleeping bags, heaters, and food. Tr. (9/4/24 PM) 167; ECF No. 422.

When Ionov pressured Hess for details about the tour, including photos and videos, Yeshitela intervened and sent Ionov the following messages:

> This is Chairman Omali Yeshitela. I understand what Alex is asking for, but I don't know what relationship that has with the promise you made to us about getting the money to us right away, within two days of our expenditures. The fact is that the amount of money we spent was very high for our party and we would not have borrowed the money if you had not guaranteed immediate replacement.... [I]t must be understood that we entered this relationship with the Anti-Globalization Movement of Russia as allies, not employees.... One of the reasons we sent the plan of action to you detailing our movement is your promise to provide international media. Please send the report on what media you provided for our action.

*Id.* at 160.

In early February, Ionov sent two reimbursements totaling $7,000. Tr. (9/4/24 PM) 167, ECF No. 422. The other $5,000 promised by Ionov was never sent. *Id.* at 168.

On cross-examination, Agent Drupp agreed that the government's evidence proved that there was an "alliance between the African People's Socialist Party and the AGMR to work together on certain issues." *Id.* at 197. The APSP defendants believed they would advance their core goals by partnering with Ionov. *Id.* at 195-96. Defendants were aligned with Ionov on certain issues, and they openly disagreed with Ionov on other issues, such as gay rights. *Id.* at 196. Ionov never disclosed to the defendants that he had a direct connection to the Russian government. Rather, Yeshitela was "guessing" that Ionov could be connected; that it was "more than likely." *Id.* at 197. Agent Drupp testified that she has seen no evidence "that any of the defendants knew that they were supposed to somehow register with the Attorney

General's Office." *Id.* at 228.

Special Agent Myers is a native Russian speaker and was used by the government to introduce electronic messages seized from "iCloud" in which Ionov discussed his relationship with the defendants with other Russians. Tr. (9/5/24 AM) 17, 20, ECF No. 393. Over objection, the district court allowed the government to introduce these electronic messages under the co-conspirator hearsay exception. Tr. (9/5/24 PM) 113, ECF No. 423.

Ionov's "iCloud" and "WhatsApp" reveal that he was a confidential informant to the FSB, a Russian intelligence agency. *Id.* at 242. Agent Myers described Ionov as an "asset" who reported to FSB officers named Popov and Sukhodolov,[3] described as his "handlers." *Id.* It was undisputed that Ionov's relationship with the FSB was kept secret from the defendants. *Id.* at 247-48.

The date on which Ionov first became an informant was not clear. *Id.* at 242-43. Ionov's earliest reports to the FSB were from 2017, after the defendants' two trips to Moscow. *Id.* at 243.

In a 2021 report, Ionov told his handler that he and the Uhuru movement had a "bilateral cooperation program." Tr. (9/5/24 PM) 155, ECF No. 423. In one message, Ionov commented that he was "ruining" the Uhuru movement by his

---

[3] The government disclosed that, in September 2017, Sukhodolov traveled to the United States on a visa to "consult" with the FBI. Tr. (9/5/24 AM) 67, ECF No. 393. The purpose of this consultation was not revealed.

interference. Tr. (9/5/24 AM) 74, ECF No. 393.

Certain messages indicated that Ionov sometimes received small sums of money from his handlers. One message discussed an exchange of 100,000 Rubles (about $1,100). *Id.* at 79. Ionov was required to send detailed reports about the APSP and other U.S.-based activist groups in order to receive payments. *Id.* at 96.

Ionov often fabricated information in his reports to impress his bosses. Tr. (9/5/24 PM) 149, 232, ECF No. 423. (Ionov falsely claimed that he helped Yeshitela come up with the idea to demand reparations, something the defendants had been doing for many years before they met Ionov in 2015.); *Id.* at 155 (Ionov claimed to have "fully" financed the defendants' "reparations tour" which he said visited "eight U.S. states."); *Id.* at 227 (Ionov claimed to have supplied funds to start the APSP radio station called Black Power FM); *Id.* at 202 (Ionov's handler suggested that Ionov is stretching the truth to get more money); *Id.* at 239-40 (Ionov falsely claimed that he donated $450 to the political campaign of Erica Cainion, a member of the Uhuru group); *Id.* at 246 (Ionov falsely claimed to have made donations to the Uhuru movement in 2020 and 2021).

Agent Myers testified that she found no record that the defendants had notified the Attorney General that they were acting in the U.S. as agents of a foreign government. *Id.* at 190.

On cross-examination, Agent Myers testified that Ionov spoke as if he really

cared about the conditions of black people in the United States. *Id.* at 248

Agent Bowen was the lead agent on the case. She testified about additional electronic messages and documents seized from defendants' computers and the iCloud. On July 4, 2015, Hess received a message advising that the AGMR wanted to financially support the work of the APSP in a "public way" and needed detailed information about APSP events, required by their tax ministry in order to release the funds. Tr. (9/9/24 PM) 109, ECF No. 424. Hess advised her colleagues. On July 11, Hess sent Ionov a list of "expenses for upcoming actions." Tr. (9/6/24 AM) 127, ECF No. 394.

On July 17, the APSP received a $500 donation from AGMR sent through PayPal. *Id.* at 128. On July 20, an article authored by Ionov appeared in the Burning Spear, the newspaper of the APSP. *Id.* at 125. Ionov's article was a critique of U.S. militarism, a core issue of APSP. Tr. (9/9/24 PM) 116, ECF No. 424. The Burning Spear regularly publishes guest articles and had previously published a piece by Ionov in 2014. *Id.*

On July 22, 2015, Ionov messaged Hess inquiring, "what you and Omali think of making multiple organization worldwide statement demanding to the acknowledgment of ongoing genocide against black people in America." Tr. (9/6/24 AM), ECF No. 394. Hess responded, "I will speak to the Chairman about this. It sounds to me like a really important thing to do." *Id.* at 122. Eight days later, Hess

messaged Ionov: "We are excited to do this." *Id.* at 132. Ionov urged Hess to hurry up and complete and post the petition while Hess explained why such a petition cannot be rushed. Hess posted the petition online on September 4, 2015. *Id.* at 136.

On cross-examination, Agent Bowen testified that the relationship between the APSP defendants and Ionov seemed to be based on their alignment on issues, especially opposition to U.S. imperialism, a core issue of the APSP. Tr. (9/9/24 PM) 108, ECF No. 424. Ionov and his team also appeared to "really care about the violence against the people of African descent in the United States." *Id.* at 121, 129. Further, the APSP defendants valued Ionov's access to international press which allowed them to spread their message and promote their core issues. *Id.* at 108.

Agent Bowen conceded that at no time did the APSP defendants agree to take orders from or be directed by Ionov. *Id.* at 113, 123. Ionov made requests for certain actions, described as overt acts in the indictment. *Id.* at 122, 128, 132, 142, 165-67, 176. But he never made demands or "directed" the APSP defendants to perform any of the overt acts alleged in the indictment. *Id.* at 113. Agent Bowen conceded that the APSP defendants had no obligation "to say yes" to Ionov's requests. *Id.* at 143.

In August 2015, Hess requested a letter of invitation for Yeshitela and the APSP to attend the September Dialogue of Nations conference hosted by Ionov and the AGMR. *Id.* at 135. Ionov's assistant responded that they would invite Yeshitela on "condition is that he should talk about issue and problem of creating a separate

11

state." *Id.* Hess replied by sending Ionov a document explaining that the APSP has "unconditional solidarity with Indigenous people and would not claim their own state on land that they believe belongs to Indigenous people." *Id.* at 139-40.

There was very little communication between the AGMR and the APSP defendants between February 2016 and February 2022. *Id.* at 167. Sometimes the AGMR would reach out but the defendants would not respond. *Id.* In April 2020, the AGMR invited defendants to a "Dialogue of Nations" conference in Donetsk promising that "all major anti-war, human rights and national liberation movements of the world will take part." *Id.* at 168. This conference was later moved online because of COVID-19. *Id.* Defendants Yeshitela and Nevel participated on zoom. *Id.* at 196.

After Russia invaded Ukraine in February 2022, the APSP defendants held some online events in which they blamed the United States for provoking the war. *Id.* at 172-73, 207. The indictment names these speeches as overt acts, SI 28-29, ECF No. 12, and charges the APSP defendants with spreading "Russian propaganda and disinformation" *Id.* at 10. Agent Bowen conceded, however, that the APSP defendants' position on the conflict between Russia and Ukraine had been consistent since "before 2014" and before they met Ionov. [4] Tr. (9/9/24 PM) 173, ECF No. 424.

---

[4] The APSP defendants' position is that the U.S. provoked the conflict by expanding NATO towards Russia's border, arming Ukraine, and by fostering the coup in 2014 that overthrew Ukraine's democratically-elected president and

Agent Bowen had no "doubt" that the defendants' views on the conflict were "sincere and heartfelt." *Id.*

In March 2022, Ionov asked Yeshitela if the APSP would organize a demonstration outside Facebook headquarters in Menlo Park, California, to protest censorship of Russia's side of the conflict. *Id.* at 176-77. Yeshitela discussed Ionov's request with his colleagues. *Id.* at 177. At this meeting, which was recorded and found on the APSP defendants' computers, APSP leaders decided that free speech is a core concern of the party and that African people have had long struggles with censorship. *Id.* The defendants agreed to organize the demonstration. They did not request or receive any money from Ionov. *Id.* at 180. Agent Bowen agreed that the APSP defendants' decision to protest Facebook appears based on their "heartfelt ... conclusion that it's something that aligned with their interests." *Id.* at 182.

### ii. The government called two Russia experts.

Over objection,[5] the government called two expert witnesses to testify about the history of Russia, the Soviet Union, and Russian intelligence agencies and operations. Brian Taylor testified about the cold war, Vladimir Putin's rise to power,

---

installed a "U.S./EU puppet regime." *See, e.g.*, *OmaliTaughtMe Sunday Study,* https://www.youtube.com/live/m5T00oNC4XE?feature=share&t=105; at 32:00-34:00 (Feb. 27, 2022); *Ukraine, Russia, EU, U.S. and the crisis of imperialism*, The Burning Spear, Apr. 20, 2014, https://theburningspear.com/1279/.

[5] In a written motion, the APSP defendants argued the proposed expert testimony would not help the trier of fact understand any fact in issue and was unfairly prejudicial to the defense. Mot. in Lim. 2, ECF No. 194.

the Russian intelligence agencies, and Russia's conflict with Ukraine. Tr. (9/4/24 AM) 35-41, ECF No. 392. Taylor testified that after the cold war ended, Russia's relationship with the United States started out friendly and then became "adversarial or confrontational." *Id.* at 42.

On cross-examination, Taylor stated that he did not review any evidence in the case. *Id.* at 43-44. He agreed that FSB agents might lie or exaggerate in their reports. *Id.* at 43. Taylor agreed that "both sides played a role in the deterioration" of the relationship between Russia and the United States. *Id.* at 54. Taylor agreed that the fighting between Russia and Ukraine began in 2014 after Ukraine President Yanukovych was removed from office and replaced with a successor "more friendly towards NATO and the west." *Id.* at 52. Taylor agreed that United States Secretary of State James Baker made an oral promise not to expand NATO and that the United States' decision to break that promise and expand NATO "east towards the border of Russia" was a "factor" in the deterioration of friendly relations between the U.S. and Russia. *Id.* at 54-55.

Thomas Rid testified that Russian intelligence agencies use "active measures" or "covert actions" to shape political developments in adversary countries like the United States. Tr. (9/6/24 AM) 18-25, ECF No. 394. On cross-examination, he conceded that intelligence agencies in the United States also use covert actions targeted at adversaries. *Id.* at 27.

### iii. The APSP defendants published 33 exhibits but called no witnesses.

The APSP defendants introduced 33 exhibits, including documents and videos dating back to the 1970s that described APSP's goals and beliefs. Tr. (9/10/24) 41-54, ECF No. 392 They called no witnesses. *Id.* at 39.

### iv. The Verdict.

The jury came back with a verdict of not guilty on the § 951 charge and guilty on the § 371 conspiracy charge. Tr. (9/12/24) 15-16, ECF No. 399.

### c. The Sentencing.

On December 16, 2024, the district court sentenced the APSP defendants to 36 months' probation. Sent'g Tr. 47, ECF No. 418.

## III. Standards of Review

This Court "review[s] the constitutionality of a statute de novo. *United States v. Dean*, 635 F.3d 1200, 1203 (11th Cir. 2011). This Court "review[s] the sufficiency of the evidence to determine whether, viewing the facts in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. O'Steen*, 133 F.4th 1200, 1217 (11th Cir. 2025). This Court "review[s] de novo whether a challenged jury instruction misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023) (internal quotations omitted) ("*Ruan* III"). This Court "review[s] a district court's rejection

of a proposed jury instruction for an abuse of discretion." *United States v. Booker*, No. 23-14041, 2025 U.S. App. LEXIS 10482, at *24 (11th Cir. Apr. 30, 2025). This Court "review[s] claims of prosecutorial misconduct de novo because they involve a mixed question of law and fact." *United States v. Schmitz*, 634 F.3d 1247, 1259 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

First, the lower court erred when it found that political expression loses its First Amendment protection after the government alleges that it was done at the behest of a foreign government. No authority supports this proposition. Rather, years of precedent establish that, under the First Amendment, lawful political speech cannot be criminalized. *See, e.g.*, Meyer v. Grant, 486 U. S. 414, 421 (1988).

Second, the government presented insufficient evidence that the APSP defendants conspired to violate 18 U.S.C. § 951. A conspiracy to violate Section 951 requires that the government prove an agreement to act under direction or control of a foreign government or official, and knowledge of § 951's registration requirement. The government's case agents admitted that there was no proof of either of these elements.

Third, the jury was misled to believe that it could convict despite the absence of evidence as to the underlying crime. The lower court erred when it refused to instruct the jury on the elements of the underlying crime in the conspiracy elements instruction. Then, the government misled the jury when it incorrectly argued in summation that the defendant's partnership with a Russian national was sufficient to convict on conspiracy charge. Finally, the government committed misconduct when it falsely suggested that the defendants planned to build a doxing website with a foreign government.

**ARGUMENT**

I. **THE LOWER COURT'S FINDING, THAT LAWFUL POLITICAL SPEECH LOSES ITS FIRST AMENDMENT PROTECTIONS WHEN THE SPEAKER IS ALLEGED TO BE A RUSSIAN AGENT, SHOULD BE REVERSED.**

The APSP defendants moved to dismiss the indictment on grounds that it directly targets lawful political speech, a core First Amendment right. Mot. to Dismiss, ECF No. 107. The lower court denied the motion, adopting the Magistrate Judge's Report and Recommendation ("R & R") which found that speech loses its protection under the First Amendment "when done at the direction or control of a foreign government." R & R 7-13, ECF No. 157; Order, ECF No. 222 (adopting R & R). Because the lower court's finding conflicts with nearly a century of Supreme Court decisions, this Court should reverse and order the indictment dismissed.

It is axiomatic that political speech is a core value protected by the First Amendment. *See, e.g.*, *Meyer v. Grant*, 486 U. S. 414, 421 (1988) (First Amendment was fashioned "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"); *Buckley v. Valeo*, 424 U.S. 1, 40 (1976) (political expression is "at the core of our electoral process and of the First Amendment freedoms"); *NAACP v. Button*, 371 U.S. 415, 431 (1963) ("Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association."); *Herndon v. Lowry*, 301 U.S. 242, 259

(1937) (peaceful agitation for a change of our form of government is within the guaranteed liberty of speech).

Further, the Supreme Court has assigned the highest level of protection to political speech. In *Meyer v. Grant*, the Court struck down a state law criminalizing the act of paying petition circulators to assist in gaining ballot access, noting that in the area of political rights, "the importance of First Amendment protections is at its zenith." 486 U.S. at 425. In *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965), the Court found that even allowing a criminal prosecution of protected expression to proceed to trial may have a "chilling effect upon the exercise of First Amendment rights." "For free expression -- of transcendent value to all society, and not merely to those exercising their rights -- might be the loser." *Id*. at 486.

Nevertheless, the lower court finds: "Although the Defendants have identified in the Superseding Indictment numerous allegations related to instances of political speech, such speech when done at the direction of a foreign agent is properly within the scope of acts under Section 951." R & R 13, ECF No. 157. This finding conflicts with nearly a century of Supreme Court decisions.

In *De Jonge v. Oregon*, 299 U.S. 353 (1937), the defendant was convicted under an Oregon "criminal syndicalism" statute for assisting in the conduct of a public meeting, otherwise lawful, held under the auspices of the Communist Party. She was sentenced to seven years in prison. *Id*. at 358. The Supreme Court reversed.

19

It explained: "The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects." *Id.* at 365.

Under *De Jonge*, this indictment should have been dismissed. The utterances charged are pure political speech that do not transcend the bounds of the freedom of speech which the Constitution protects. The government has not disputed this fact. There is no allegation that any of the defendants' speech furthered any crime such as espionage or fraud, incited "imminent lawless action" under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), or was obscene under *Roth v. United States*, 354 U.S. 476 (1957).

Nor does this case present any legitimate national security concerns.[6] Defendants are peaceful agitators and long-time critics of U.S. foreign policy. The indictment charges peaceable political protests and public discussions in which defendants demand reparations for past crimes against African people; oppose the banning of Russia from the 2016 Olympic Games; oppose U.S. policy arming

---

[6] Compare *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010) (criminal prosecution of "material support or resources" to designated terrorist organization upheld where Congress found that "all contributions to foreign terrorist organizations further their terrorism").

Ukraine and fueling its conflict against Russia; and oppose censorship of lawful speech.

Because their speech is lawful, the defendants' alleged relationship to Russia is immaterial. The holding in *De Jonge* was unambiguous.

> [P]eaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.

*Id.* at 365. Similarly in the case at bar, the government cannot criminalize lawful political speech simply by alleging that defendants are speaking for Russia.

The lower court attempts to distinguish *De Jonge* on the grounds that "there the Supreme Court tackled a content-specific statute whereas Defendants here are facing prosecution of a content-neutral statute.[7]" R & R 17, ECF No. 157. It is well established, however, that content neutral laws will be considered content-based when used by the government to target speech. *See Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 164 (2015).

---

[7] Section 951 is content neutral on its face because it was never intended to be used to target speech. Rather, Section 951 targets persons who "act" as foreign agents. The statute does not mention "speech." Indeed, this appears to be the first case in the statute's eighty-year history that it has been used to target political speech. In every other prosecution the defendants were alleged to be secret operatives or spies, see, e.g., *United States v. Campa*, 529 F.3d 980 (11th Cir. 2008); *United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010); or they were alleged to be unregistered lobbyists helping a foreign government obtain some action item sought from the U.S. Government, see, e.g., *United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021).

In *Cohen v. California*, 403 U.S. 15 (1971), the defendant was convicted of breach of the peace for wearing a jacket displaying an offensive word to protest the Vietnam War and the draft. Although the breach of peace statute was directed at conduct and not speech and was content-neutral, the Supreme Court recognized that Cohen was being prosecuted because of the government's disagreement with his political message. Accordingly, the State was required to show a "compelling reason" to prevent Cohen from delivering his message, and his conviction was reversed. *Id*. at 18-19.

The lower court attempts to distinguish *Cohen* as follows:

> Unlike *Cohen*, the prosecution against Defendants is based upon conduct rather than merely speech, as determined above in Part A. Defendants' speeches and publications alone are not necessarily "acts," but when done at the direction of a foreign government, such speeches and publications rise to the level of "acts" within the meaning of Section 951.

R & R 18, ECF No. 157.

This finding should be rejected. First, the lower court's reasoning is circular. The court finds that, because it has stripped First Amendment protections from political speech alleged to be directed by Russia, that therefore this case does not involve protected speech. Second, as shown below, the lower court cites no legal authority for its finding that conflicts with a century of Supreme Court jurisprudence. To allow the government to strip speech of protection under the First Amendment

simply by accusing the speaker of being an agent of a foreign power would gravely weaken the First Amendment's protection of political speech.

The lower court cites a single Seventh Circuit case as authority for its finding. In *United States v. Dumeisi*, the government prosecuted a publisher of an Arabic language newspaper under Section 951, alleging that he was a secret operative for Iraqi intelligence. 424 F.3d 566, 570 (7th Cir. 2005). On appeal, Dumeisi raised a First Amendment challenge to the government's use of his published articles and speeches at trial. The Seventh Circuit noted that the trial judge instructed the jury that Dumeisi's articles and speeches "are protected by the First Amendment" and "are to be considered only insofar as they may pertain to issues of motive and intent." *Id*. at 579. Dumeisi argued that this instruction was insufficient, and that the court should have instead given his instruction that read: "It is not a violation of 18 U.S.C. § 951(a) to publish a news article." The Court disagreed.

First, the *Dumeisi* Court noted evidence that Dumeisi "printed provocative articles in his paper in order to learn more about the Opposition" and that he prepared "handwritten reports" about Iraqi dissidents living in the U.S. which he passed on to Iraqi officials. *Id.* at 581. The Court concluded:

> Given that an element of § 951 is acting "subject to the direction or control of a foreign government or official," 18 U.S.C. § 951(d), and there was evidence suggesting that Dumeisi published certain articles at the behest of the IIS, we find this publication relevant and agree with the district court that Dumeisi's proposed instruction would have been "misleading as to the law."

23

*Id.*

The lower court interprets this ruling by the Seventh Circuit as establishing a new doctrine that "articles published under the direction or control of [a foreign] government thereby constitut[e] 'acts' under the statute" and thereby lose First Amendment protections. R & R 10, ECF No. 157. This is a misreading of *Dumeisi*. The court unambiguously held that the defendant's articles maintained First Amendment protection and could be considered by the jury "only insofar as they may pertain to issues of motive and intent." In other words, when Dumeisi printed provocative articles to obtain information about dissidents, which he passed on to Iraqi officials, the jury was permitted to consider those actions as relevant evidence to his motive and intent to spy for the Iraqi government.

In the case at bar, there is no allegation that the APSP defendants were spies for Russia or that they ever published articles for any nefarious purpose unrelated to their activism.[8] Accordingly, the lower court's finding that "articles published under the direction or control of the Russian government," R & R 10, ECF No. 157, are not protected by the First Amendment must be reversed.

---

[8] The indictment makes a general allegation that the APSP defendants agreed to publish articles "designed to cause dissension in the United States." SI 2, ECF No. 12. But causing "dissension" is a legitimate goal of political activists who encourage others to question their leaders and dissent from government policies.

24

## II.  THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF A CONSPIRACY AS IT PRESENTED NO EVIDENCE, AS CONCEDED BY THE GOVERNMENT'S CASE AGENTS, THAT THE APSP DEFENDANTS (1) ACTED OR AGREED TO ACT UNDER THE DIRECTION OR CONTROL OF IONOV OR THE AGMR, OR (2) KNEW OF THE REGISTRATION REQUIREMENT, ESSENTIAL ELEMENTS OF A CONSPIRACY.

A guilty verdict can be sustained only if the government introduces sufficient, credible and probative evidence that the defendant was guilty of each element of the offense. *Neder v. United States*, 527 U.S. 1, 15 (1999); *In re Winship*, 397 U.S. 358, 364 (1970). Here, the conspiracy charge alleges that the APSP Defendants "did knowingly and willfully ... agree ... to act as an agent of ... the Russian Federation and officials of that government, without prior notification to the Attorney General." SI 9, ECF No. 12. The government presented no evidence to sustain this charge and its case agents conceded this point at trial.

### A. The government's case agents unambiguously conceded that there was no evidence that the APSP defendants ever acted or agreed to act under the direction or control of Ionov or the AGMR.

The superseding indictment alleges that after returning from Moscow in May 2014, the APSP defendants entered an agreement, confusingly described as "a partnership with Ionov and AGMR . . . to act as an agent of [Russia]." SI 5, 9, ECF No. 12. The indictment alleges that defendants agreed to let Ionov and AGMR direct what they "publish ... in the APSP's media outlets," and to direct their political activities. *Id.* at 10-11, 20, 23, 24, 27. At trial, the government attempted to prove

that the APSP defendants were directed by Ionov (acting on behalf of Russia) to submit a petition charging the U.S. with genocide against African peoples, to organize a tent encampment, to publish articles and statements,[9] to protest censorship of Russian voices by a U.S. media company, and to speak out against U.S. support for Ukraine.[10] The government presented no evidence to support any of these allegations. All three of the government's case agents conceded this point without reservation.

In *United States v. Rafiekian*, the Fourth Circuit explained that "to be an agent of a foreign government" for purposes of § 951, the government must prove "mutual assent" between the defendant and the foreign government or official. 991 F.3d 529, 539 (4th Cir. 2021). Where the government proves only that the defendant was "willing to do something" that the foreign government asked, the government has failed to meet its burden. *Id.* Nor can the government carry its burden by showing only that the defendant and foreign government or official "collaborated and supported" one another. *Cf. United States v. Hoskins*, 44 F.4th 140, 150-51 (2d Cir.

---

[9] One such statement supported Russia's right to participate in the Rio Olympics; another supported the Donetsk People's Republic.

[10] The indictment also alleges that the APSP defendants allowed Ionov "to interfere directly and substantially in democratic elections in the United States by clandestinely funding and directing the political campaign of a particular candidate." SI 3, ECF No. 12. At trial, Agent Bowen conceded that "there's no evidence of election interference" and this allegation was quietly dropped from the government's case. Tr. (9/9/24 PM) 194, ECF No. 424.

2022) (collaboration and support "does not mean that [one is] under [another's] control within the meaning of the FCPA" even where there is "some evidence of direction").

Regarding the "genocide petition," in July 2015, Ionov sent Hess a message asking what she and Yeshitela "think" about getting "multiple organizations worldwide" to sign a statement acknowledging "ongoing genocide against black people in America since early years and up now." Tr. (9/6/24 AM) 13, ECF No. 394; Tr. (9/9/24 PM) 47, ECF No. 424. Agent Bowen[11] agreed that Ionov was "asking" and "not directing [Hess] to file a petition." Tr. (9/9/24 PM) 122, ECF No. 424.

Regarding the tent encampment protest, the evidence showed that on or about January 15, 2016, Ionov spoke to Omali in an unrecorded phone call and offered to fund a tent encampment protest to highlight issues raised in the genocide petition. *Id.* at 148. The defendants held an internal meeting to discuss this offer of financial support. *Id.* at 149. This meeting was recorded and excerpts were played at trial. *Id.* at 152-56. Agent Bowen conceded that in this meeting, the defendants discussed Ionov's offer and concluded that the proposed encampment protest would move their "agenda [and] movement forward." *Id.* at 157. Defendants agreed that the funds offered by Ionov would make the demonstration more impactful by allowing

---

[11] Agent Bowen was the lead investigator on the case. Tr. (9/9/24 PM) 110, ECF No. 424.

defendants to bring witnesses along and provide them food and shelter during the Chicago winter. *Id.* at 158. There was no evidence of direction or control.

Further, in a January 2016 communication, Yeshitela confirmed that APSP's relationship with Ionov was one of "allies" and not agency.[12] The government did not dispute this evidence. Rather, it misled the jury by telling it that evidence of an "alliance" with Ionov was sufficient to prove the conspiracy charge. *See infra* Section 3(A).

Agent Bowen also conceded that there was no evidence that Ionov ever directed the defendants to publish articles or statements. Rather, Ionov or his associate made requests—"Is it possible to post the articles?" Tr. (9/9/24 PM) 166, ECF No. 424. Yeshitela reviewed the materials. If he agreed with the content, he would agree to post or sign. If he did not agree, he would refuse. Often, Yeshitela would request revisions before signing. *Id.* at 166-67.

After Russia invaded Ukraine in February 2022, the defendants publicly expressed their views that the war was provoked by NATO expansion east towards Russia's border and by U.S. interference in and arming of Ukraine. Agent Bowen

---

[12] Communications in January 2016 reveal that Ionov pledged to fund the tent encampment, failed to send the promised funds, and then pressured Hess to send photographs and other details about the event. Yeshitela intervened by email and reminded Ionov that, "we entered this relationship with the AGMR as allies, not employees." Tr. (9/4/24 PM) 159, ECF No. 422. Ionov did not contest Yeshitela's characterization of their relationship.

agreed that Yeshitela had held and expressed these views about the conflict since "at least before 2014" and that his views were "sincere and heartfelt."[13] *Id.* at 173.

Finally, when Ionov reached out in March 2022 to ask the APSP to organize a protest against the censorship of Russian voices at Facebook, Yeshitela discussed this request with his leadership team which decided that free speech for dissident voices was a core issue for the APSP. Based on these discussions, the defendants agreed to organize the protest. *Id.* at 177-79.

All three case agents confirmed that the APSP defendants were not under the direction or control of Ionov. Agent Bowen conceded that Ionov made requests, not demands; that defendants were under "no obligation" to say yes; and that the APSP defendants would also refuse some of Ionov's requests.[14] *Id.* at 143. Agent Bowen agreed that Yeshitela "doesn't appear to be somebody that's for sale." *Id.* at 176. Agent Meyers testified that Ionov privately described his relationship with the APSP defendants as a "bilateral cooperation program," which means: "It goes two ways ... It's a cooperation ... It's not I'm telling you what to do, it's we're working together."

---

[13] Defendants introduced an article they published in April 2014 criticizing U.S. involvement in the "Maidan coup" that overthrew "democratically-elected president Viktor Yanukovych" and installed a "U.S./EU puppet regime." Tr. (9/10/24) 54, 123; ECF No. 397.

[14] In August 2015, Yeshitela refused Ionov's request to make a video about police repression in America. Tr. (9/9/24 PM) 56, ECF No. 424. In December 2015, Hess refused Ionov's request to "organize an action ... against Turkish aggression and their attack against the Russian plane." *Id.* at 65.

Tr. (9/5/24 PM) 230, ECF No. 423. Agent Drupp described the relationship between the APSP defendants and Ionov as an "alliance ... to work together on certain issues." Tr. (9/4/24 PM) 197, ECF No. 422.

Failure to prove an essential element entitles a defendant to an acquittal. *Jones v. United States*, 526 U.S. 227 (1999). Here, the government's lead investigators conceded that there was no evidence to support the charge that defendants were under direction or control of Russia, an essential element of the conspiracy charge. The defendants' convictions must be reversed.

### B. The only evidence of a connection to the Russian government came from inadmissible hearsay.

At trial, the government introduced chat conversations between Ionov and purported FSB officers Popov, Sukhodolov, Vistoropsky, and Mityagin. These messages were the only evidence that connected Ionov to a Russian official or the Russian government. The APSP defendants argued in a motion *in limine* and contemporaneous objections that these chats should be excluded under Federal Rule of Evidence 801(d)(2)(E) because there was no substantial, independent evidence that they were members of the alleged conspiracy or that their statements were made in furtherance of the alleged conspiracy. Mot. in Lim., ECF No. 229. The lower court erred when it denied that motion. Order, ECF NO. 263.

"[S]tatements of a co-conspirator may be admitted under [Rule 801(d)(2)(E)] if there is substantial, independent evidence of the existence of the conspiracy at

least enough to take the question to the jury; that the defendant and declarant were both members of the conspiracy; and that the statements were made in the course of and in furtherance of the conspiracy." *United States v. McDonald*, 935 F.2d 1212, 1220 (11th Cir. 1991) (internal quotations omitted).

Here, the government produced no independent evidence that the alleged Russian co-conspirators were members of a conspiracy. These statements were also inadmissible to the extent that they did not further any conspiracy with the APSP defendants. One cannot enter a conspiracy with a government agent or informant "who aims to frustrate the conspiracy." *See United States v. Arbane*, 446 F.3d 1223 (11th Cir. 2006). Here, not only was Ionov an informant, but he also intended to frustrate the APSP Defendants' goals as indicated in a message to Popov that they were "ruining such an organization." Tr. (9/5/24 AM) 74, ECF NO. 393. Moreover, the messages were full of false information. There was no evidence that Defendants had any interest in Ionov's false statements to his handlers. Moreover, there was no evidence that the APSP Defendants had an interest in the money that Ionov received by submitting reports about the defendants to the FSB. Indeed, the APSP Defendants received no donations from Ionov during the time period in which he authored his reports and messages.

### C. The government's case agent conceded that there was no evidence that the APSP defendants had knowledge of § 951's registration requirement.

The government charged that the defendants "did knowingly and willfully" conspire to act as Russian agents without registering in violation of 18 U.S.C. § 371. SI 9, ECF No. 12. There was no evidence, however, that the defendants knew of the registration requirement, as conceded by the government's case agent:

> Q. In the three years that you investigated this case and the numerous emails that you reviewed, Facebooks, and all the communications, did you ever see anything that indicated that any of the defendants knew that they were supposed to somehow register with the Attorney General's office?
>
> A. No.

Tr. (9/4/24 PM) 228, ECF No. 422. The district court also recognized the lack of evidence:

> I have no indication that any defendant was aware of any reporting requirement. There is not any hint in this evidence that they were aware that, hey, before we do our encampment tour or whatever, we have to do this reporting requirement.

Sent'g Tr. 36-37, ECF No. 418

The APSP defendants argued in memoranda, Rule 29 motions, and at the jury instruction conference that they could not be convicted on the conspiracy charge without evidence that they knew of § 951's registration requirement. Mot. for J. of Acquittal 11-12, ECF No. 279; Suppl. Mem. 1-4, ECF No. 277; Mot. for New Trial 13-14, ECF No. 305; Tr. (9/10/24 AM) 22, 34-35, 37, 56, ECF No. 397. The district court rejected the argument but acknowledged the likelihood of reversal. Sent'g Tr. 45, ECF

No. 397 ("And so [the innocent conduct is] an issue in my mind. And the Eleventh Circuit is soon, I'm sure, to straighten me out.").

In rejecting defendants' argument, the district court felt bound by this Court's holding in *United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010), that § 951 is a general-intent crime and knowledge of the registration requirement need not be proven. Tr. (9/9/24 AM) 14, ECF No. 395. The district court noted, however, that *United States v. Rehaif*, 588 U.S. 225 (2019), which found that courts must read in a *mens rea* where one is absent, "is very supportive of a view . . . [that] the Eleventh Circuit might look at *Duran* differently." *Id.*; *see also* (Tr. (9/9/24 AM) 21; ECF No. 395 ("And on the *Rehaif* thing, just between you and me, I hope you're right, okay? . . . But, you know, it's not my place to tell the Eleventh Circuit that their cases are no good because of, you know, a firearm case that came out later.").

The lower court's finding that *Duran* permits convictions under § 951 for innocent conduct is flawed. In *Duran*, this Court considered precedent that the government must prove knowledge where conduct is otherwise innocent. It thus recognized that its holding may be problematic if applied to innocent conduct. 596 F.3d at 1296 n.9 ("Because Duran's conduct was not innocent, we need not in this case express an opinion as to the constitutionality of possible applications of § 951 to completely innocent conduct."); *see, e.g.*, *Lambert*, 355 U.S. at 226; *Liparota v. United States*, 471 U.S. 419, 425 (1985); *Elonis v. United States*, 575 U.S. 723, 734 (2015)

("a defendant must be blameworthy in mind before he can be found guilty" (internal quotations omitted)).

For instance, in *Lambert v. California*, a Los Angeles Municipal Code made it "unlawful for 'any convicted person' to be or remain in Los Angeles for a period of more than five days without registering." 355 U.S. 225, 226 (1957). As there was no evidence that the defendant knew she was required to register, the Supreme Court reversed. *Id.* at 229-30. Laws criminalizing a failure to register, the Court explained, violate due process unless there is evidence of "actual knowledge of the duty to register" or "proof of the probability of such knowledge and subsequent failure to comply." *Id.* at 226.

To the extent that the lower court is correct that *Duran* required it to find that the government can prove a conspiracy to violate Section 951 without evidence that defendants had knowledge of the registration requirement, that finding should be reversed as *Duran* has been abrogated by the Supreme Court's decision in *Rehaif*. In *Rehaif v. United States*, decided nine years after *Duran*, the Supreme Court found that the statute prohibiting possession of firearms by those in the country illegally requires knowledge of one's immigration status. 588 U.S. at 232. The Court explained that a "scienter requirement [must be included] even where the statutory text is silent on the question." *Id.* at 225. Three years later, in *Ruan v. United States*, the Supreme Court found that the statute requiring doctors to dispense only "authorized" prescriptions

requires knowledge that the prescription was unauthorized even though the statute omits reference to a *mens rea* for that element. 597 U.S. 450, 455 (2022) ("*Ruan II*"). Knowledge of the registration is required also because, as this Court held on remand in *Ruan III*, the jury must find that the defendants "knew the illegal object of the conspiracy" or "'willfully' joined that plan." *Id.* at 1299. Accordingly, where, as here, it is undisputed that there was no evidence of knowledge of the element that separates innocent from wrongful conduct, a conspiracy conviction cannot stand.

Here, it is undisputed that the APSP defendants had no knowledge of § 951's registration requirement and, therefore, could not have known the illegal object of the conspiracy. *Duran* does not control this case as the APSP's defendants' conduct was innocent absent the registration requirement. Indeed, their speech is protected political speech and their partnership with Ionov was permissible according to the State Department's website:

> There is no prohibition in U.S. law on foreign funding of NGOs; whether that foreign funding comes from governments or non-government sources. . . . [NGOs] are free to collaborate with foreign NGOs or foreign governments to achieve their purposes. There are no regulations that restrict U.S. NGOs from attending conferences abroad, finding donors overseas, or performing work internationally.

Non-governmental Organizations (NGOs) in the United States, U.S. Dep't of State (Jan. 20, 2021), https://www.state.gov/non-governmental-organizations-ngos-in-the-united-states/; *see also* Sent'g Tr. 45, ECF No. 418 (any "agency [between the defendants and Ionov and/or AGMR] is totally legal if you put aside the notification

requirement"). Accordingly, the conspiracy convictions must be reversed.

III. **THE JURY WAS MISLED TO BELIEVE THAT IT COULD CONVICT THE DEFENDANTS ON THE CONSPIRACY CHARGE DESPITE THE ABSENCE OF EVIDENCE AS TO THE UNDERLYING CRIME.**

   A. **The lower court's refusal to instruct the jury on the elements of the underlying crime, coupled with the government's misleading closing argument, requires reversal.**

The instruction to the jury on the Count One conspiracy spans four pages. It tells the jury that it must find beyond a reasonable doubt that defendants willfully joined a conspiracy, knew the unlawful purpose, and that one of the conspirators engaged in at least one overt act. Tr. (9/10/24) 187, ECF No. 397. But nowhere in this lengthy instruction is the jury told that it must find that defendants agreed to act subject to the direction or control of Russia. Thus, defendants proposed that the court instruct the jurors "that they have to find the elements of the [§] 951 violation to find the conspiracy." *Id.* at 7-8. The court rejected this request and instead told the jury: "The elements of the crime alleged to be the object of the conspiracy are set forth at pages 17-19. Please refer to those.[15]" *Id.* at 186. This was prejudicial error.

This Court reviews *de novo* whether a challenged jury instruction "misstated the law or misled the jury to the prejudice of the objecting party." *Ruan III*, 56 F.4th

---

[15] The jury first learns the elements under Section 951 in the instruction for Count 2, the substantive offence, which as the lower court noted, came "six pages later." Tr. (9/10/24) 8, ECF No. 397.

at 1296. "Where the error is the omission of an element of the crime we will reverse unless it can be shown the error was harmless beyond a reasonable doubt." *Id*. Here, the conspiracy charge omitted the elements of the object of the conspiracy, necessary to convict. Those elements were included only in the instructions on the substantive offense, Count 2.

This omission was especially harmful here because the conspiracy instruction included confusing language describing the conspiracy as "a kind of 'partnership' for criminal purposes." Tr. (9/10/24) 186, ECF No. 397. This language makes sense when the object of the conspiracy is a crime like fraud or drug distribution. But here, the underlying crime is acting as an "agent" of a foreign government, defined as being "subject to the direction or control." The court's instructions did not explain how a person can be subject to the "direction or control" of his "partner." Further, the indictment also conflates the concepts of partnership and agency, accusing defendants in Paragraph 1 of being under "direction or control" of Ionov, and in Paragraph 12 of entering "into a partnership with Ionov." SI 2, 5, ECF No. 12.

During closing arguments, the government exploited these defects in the instructions to wrongly suggest to the jury that it should convict defendants of conspiracy if it found that they partnered with Ionov, a fact that was never disputed. First, the prosecutor reminded the jury that Yeshitela used the word "allies" when describing the APSP defendants' relationship with AGMR. The prosecutor argued:

What's another word for allies? Partners. This was a partnership. As you'll be instructed, the conspiratorial agreement that we need to prove is a kind of partnership for criminal purposes.

Tr. (9/10/24) 69, ECF No. 397. Then in rebuttal argument, the prosecutor told the jury:

Call it an alliance. Call it a partnership. They allied, they partnered, they conspired with Aleksandr Ionov to work on behalf of the Russian government. That's what the evidence has shown.

*Id.* at 168.

These arguments urged the jury to convict based on entirely innocent conduct of partnering with a foreign national. Prosecutorial arguments that misstate the law and are designed to produce wrongful convictions require reversal if they "prejudicially affect the substantial rights of the defendant." *United States v. Wheeler*, 16 F.4th 805, 826 (11th Cir. 2021). Here, the government's misleading arguments, coupled with the deficient and confusing jury instructions, invited a wrongful conviction.

**B. The lower court abused its discretion in refusing to give a limiting instruction to prevent the jury from considering evidence introduced in Defendant Romain's case against the APSP defendants.**

The APSP defendants were harmed by being charged in a general conspiracy with defendant Romain, a former member of the APSP who was formally "expelled" from the group in 2018. Tr. (9/9/24 PM) 179, ECF No. 424. On November 18, 2018,

the APSP sent Romain a letter advising that, effective on the date of writing, "you have been expelled from the African People's Socialist Party... pursuant to a unanimous vote by the National Central Committee of the African People's Socialist Party." Tr. (9/10/24 PM) 46, ECF No. 397. After his expulsion, Romain moved to Atlanta and formed his own activist group called Black Hammer. Agent Bowen conceded that after being expelled in 2018, there were no further communications between the APSP defendants and Romain. Tr. (9/9/24 PM) 179-80, ECF No. 424.

Beginning around 2021, Romain began receiving direction and support from Ionov. The conspiracy charge against Romain involves conduct from 2022, more than three years after his expulsion from APSP.[16]

The APSP defendants moved for pretrial severance. Mot. to Sever, ECF No. 199. When that was denied, they requested limiting instructions to prevent the jury from considering the evidence offered against Romain in their case. Tr. (9/6/24 AM) 89-91, ECF No. 394; Tr. (9/6/24 PM) 122, ECF No. 425. The court denied these requests without explanation. *Id.* This was an abuse of discretion. *See United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992) ("trial court may not disregard the rights of the defendant by declining to give an appropriate limiting instruction").

In *Gonzalez*, the court failed to give a requested limiting instruction to prevent

---

[16] *See* SI 31-34, ECF No. 12.

the jury from considering proof offered on one count as evidence on a second unrelated count. This Court held that the trial court abused its discretion where the requested instruction was "substantively correct," "not substantially covered," and where the "absence of a limiting instruction opened the door for the jury to consider this evidence in an improper light." *Id*. at 1516-17.

Similarly here, the requested limiting instruction was substantively correct. There was no legal basis for the jury to consider evidence of Romain's actions years after his expulsion from the APSP. The prejudice to these defendants is clear. The government can point to no evidence that the APSP defendants willfully joined any conspiracy to act under Ionov's direction or control. But the evidence against Romain was much stronger. After one protest in March 2022, Romain told Ionov: "That was fun. Who we attacking next?" Tr. (9/9/24 AM) 44, ECF No. 395. When Ionov asked Romain to organize a protest of CNN, Romain replied: "When do we need this done? ... Is there anything particular you think I should say in the video?" *Id.* at 56-57.

The conspiracy instruction directed the jury to find the defendants guilty if "one of the conspirators knowingly engaged in at least one overt act." Tr. (9/10/24) 187, ECF No. 397. And the government told the jury that the defendants' alliance or partnership with Ionov was all it needed to prove for a conspiracy. Thus, the lower court's decision to allow Romain's actions to be considered against the APSP

defendants was a likely cause of their wrongful convictions.

**C. The government committed misconduct by falsely accusing the APSP defendants of planning to build "a doxing website with the Russians."**

In a recorded meeting on January 15, 2016, the APSP defendants briefly discussed an offer from Ionov to help them build a website to "[publish] photos of all cops and judges and things like that who have killed ... harmed African people…." Mot. for New Trial Ex. A, ECF No. 305. After about ten minutes of discussion, Ionov's offer was rejected. No such website was ever planned, built or further discussed.

However, near the end of trial, during re-direct examination of the government's third and final case agent, the prosecutor used leading questions to falsely accuse the defendants of planning to build "a doxing website" with the Russians. Several defense objections to this evidence were overruled.

First, the prosecutor had the case agent define "doxing" as putting "personal information about another individual online ... so that, you know, harm could come to them potentially." Then the prosecutor asked:

Q. And in that meeting, did they discuss a plan to work on a doxing website with the Russians?
A. Yes.

\*\*\*

Q. And so when Omali Yeshitela says that they're going to build -- that they

41

have support to build a website to publish the personal information for judges, police officer, and prosecutors, whose support is he referring to?

A. He's referring to AGM support.

Tr. 9/9/24 PM, pp. 220-23.

The prosecutor knew that this accusation was false, admitting later at the sentencing hearing that the defendants took "no further action ... related to this website" after their brief discussion on January 15, 2016. Sent'g Tr. 13, ECF No. 418.

The use of a false and inflammatory claim, calculated to impugn the character of the defendants and to induce fear and contempt in the minds of jurors, warrants reversal of the convictions. *See United States v. Gonzalez*, 122 F.3d 1383, 1389 (11th Cir. 1997). As the Supreme Court has held, a United States attorney has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1934).

The prejudice to these defendants is clear from the record where, during deliberations, the jury sent the following note to the Judge:

> The jurors are requesting that our personal information be sealed. This was a concern since day 1, however following testimony regarding "doxing," we believe that this concern is valid and realized.

Jury Note, ECF No. 286.

# CONCLUSION

For the foregoing reasons, Counsel respectfully requests that Defendants-Appellants Omali Yeshitela's, Penny Joanne Hess's, and Jesse Nevel's judgments be vacated.

Respectfully submitted,

/s/ Leonard C. Goodman
Leonard C. Goodman
Angela J. Reaney
Goodman Law Office LLC
53 W. Jackson Blvd, Suite 1650
Chicago, IL 60604
(312) 986-1984
Attorneys for Penny Hess

/s/ Ade Griffin
Ade Griffin, Esq.
Griffin Inskeep Law LLC
224 Datura St.
Suite 900
West Palm Beach, FL 33401
(561) 320-6006
Attorney for Omali Yeshitela

/s/ Mutaqee Akbar
Mutaqee Akbar, Esq.
Akbar Thomas
619 N. Copeland St.
Tallahassee, FL 32304
(850) 383-0000
Attorney for Jesse Nevel

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,800 words according to Microsoft Word's word count, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

/s/ Leonard C. Goodman
Leonard C. Goodman
Attorney for Penny Hess

/s/ Ade Griffin
Ade Griffin
Attorney for Omali Yeshitela

/s/ Mutaqee Akbar
Mutaqee Akbar
Attorney for Jesse Nevel

# CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, a true copy of the foregoing was filed using the Court's Electronic Case Filing system, which will send notification to the United States Attorney's Office.

/s/ Leonard C. Goodman
Leonard C. Goodman
Attorney for Penny Hess

/s/ Ade Griffin
Ade Griffin
Attorney for Omali Yeshitela

/s/ Mutaqee Akbar
Mutaqee Akbar
Attorney for Jesse Nevel