No. 24-14097

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AUGUSTUS ROMAIN, JR., ET AL,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Middle District of Florida
(Hon. William F. Jung, No. 8:22-cr-259)

_____

BRIEF FOR THE UNITED STATES

_____

GREGORY W. KEHOE
United States Attorney for the
Middle District of Florida

JOHN A. EISENBERG
Assistant Attorney General for
National Security

JOSEPH P. MINTA
Appellate Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel.: 202-353-9055
joseph.minta@usdoj.gov

No. 24-14097

*United States v. Augustus Romain, Jr., et al.*

## CERTIFICATE OF INTERESTED PERSONS

The following persons have an interest in the outcome of this case:

1. Akbar, Mutaqee, Esq.;

2. Asokan, Risha, Assistant United States Attorney;

3. Chang, Emily C. L., Assistant United States Attorney;

4. Flynn, Hon. Sean P., United States Magistrate Judge;

5. Goedman, Menno, Trial Attorney,
   National Security Division, U.S. Department of Justice;

6. Goodman, Leonard, Esq.;

7. Griffin, Ade, Esq.;

8. Handberg, Roger B., United States Attorney;

9. Hess, Penny, Defendant-Appellant;

10. Hernandez, Daniel Mario, Esq.;

11. Ionov, Aleksandr Viktorovich;

12. Jung, Hon. William F., United States District Court Judge;

13. Krigsman, Cherie, Assistant United States Attorney;

14. Kurpiers, II, Ronald J., Esq.;

15. Lambert, George, Esq.;

16. Marcet, Daniel. J., former Assistant United States Attorney;

C-1 of 2

No. 24-14097

*United States v. Augustus Romain, Jr., et al.*

**CERTIFICATE OF INTERESTED PERSONS (cont'd)**

17. Minta, Joseph P., Appellate Attorney,
    National Security Division, U.S. Department of Justice;

18. Nevel, Jesse, Defendant-Appellant;

19. O'Brien, Mark J., Esq.;

20. Popov, Yegor Sergeyevich;

21. Porcelli, Hon. Anthony E., United States Magistrate Judge;

22. Reaney, Angela, Esq.;

23. Rhodes, David P., Assistant United States Attorney,
    Chief, Appellate Division;

24. Romain, Jr., Augustus, Defendant-Appellant;

25. Sansone, Hon. Amanda A., United States Magistrate Judge;

26. Smith, Jeffrey M., Acting Chief, Appellate Section,
    National Security Division, U.S. Department of Justice;

27. Sukhodolov, Aleksey Borisovich;

28. Sumner, Demetrius, Trial Attorney, U.S. Department of
    Justice;

29. Tuite, Hon. Christopher P., United States Magistrate Judge;

30. Yeshitela, Omali, Defendant-Appellant.

No publicly traded company or corporation has an interest in the outcome of this appeal.

C-2 of 2

# STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED .......................................................................3

STATEMENT ...................................................................................4

    A.    The Defendants' Relationship With Ionov and AGMR..............4

    B.    The Defendants' Actions on Behalf of Russia ...........................8

    C.    Proceedings Below .................................................................13

SUMMARY OF ARGUMENT ..................................................................18

ARGUMENT .........................................................................................21

    I.    Sufficient Evidence Supported the Defendants' Conspiracy
        Convictions .................................................................................21

    A.    The Defendants' Own Words Confirm Their Criminal
        Conspiracy to Violate Section 951.............................................21

    B.    Relying on this Evidence, the District Court Correctly
        Overruled the Defendants' Hearsay Objection.........................25

    II.    There Was No Abuse of Discretion in the Jury Instructions ........28

    A.    The Jury Was Correctly Instructed on the Elements of
        Conspiracy ...............................................................................29

    B.    The Jury Was Correctly Instructed that a Conspiracy Is a
        Kind of "Partnership for Criminal Purposes" ...........................34

ii

C.    The Jury Was Correctly Instructed Regarding *Mens Rea*........38

1.    The Law of the Circuit Forecloses the Defendants'
Interpretation of Section 951..............................................39

2.    Section 951 Must Be Given a Consistent
Interpretation....................................................................41

D.    The Jury Was Correctly Instructed Regarding the
Scope of the Conspiracy..........................................................45

III. The First Amendment Does Not Immunize the Defendants'
Criminal Conspiracy .................................................................49

A.    The First Amendment's Applicability to Certain Overt
Acts Is Irrelevant.....................................................................50

B.    Section 951 Does Not Violate the First Amendment................52

IV. The District Court Did Not Commit Plain Error in
Addressing Testimony About a Potential Doxing Website ...........58

CONCLUSION ....................................................................................64

# TABLE OF AUTHORITIES

**Cases**                                                                  Page(s)

*Att'y Gen. of U.S. v. Irish People, Inc.,*
684 F.2d 928 (D.C. Cir. 1982)......................................................................57

*Burks v. United States,*
437 U.S. 1 (1978) ........................................................................................51

*Cheek v. United States,*
498 U.S. 192 (1991) ....................................................................................41

*Cohen v. California,*
403 U.S. 15 (1971) ......................................................................................57

*De Jonge v. Oregon,*
299 U.S. 353 (1937)......................................................................................57

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
11 F.4th 1266 (11th Cir. 2021) ...................................................................53

*Hitchman Coal & Coke Co. v. Mitchell,*
245 U.S. 229 (1917)......................................................................................35

*Iannelli v. United States,*
420 U.S. 770 (1975)......................................................................................51

*Lambert v. California,*
355 U.S. 225 (1957)......................................................................................42

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) ........................................................................................44

*Meese v. Keene,*
481 U.S. 465 (1987)............................................................ 20, 53, 56, 57

*Pinkerton v. United States,*
328 U.S. 640 (1946)............................................................ 19, 30, 35, 50

*Reed v. Town of Gilbert, Ariz.,*
576 U.S. 155 (2015)......................................................................................54

*Rehaif v. United States,*
588 U.S. 225 (2019)................................................................................ 40, 41

iv

**Cases (cont'd)**                                                    Page(s)

*Ruan v. United States,*
  597 U.S. 450 (2022)..................................................................40, 41

*Salinas v. United States,*
  522 U.S. 52 (1997) ...................................................................19, 30

*\*United States v. Al Jaberi,*
  97 F.4th 1310 (11th Cir. 2024) ...........................................58, 59, 62, 63

*United States v. Baston,*
  818 F.3d 651 (11th Cir. 2016)..................................................31, 46

*United States v. Bell,*
  112 F.4th 1318 (11th Cir. 2024) .......................................................21

*United States v. Brannan,*
  562 F.3d 1300 (11th Cir. 2009)........................................................36

*United States v. Browne,*
  505 F.3d 1229 (11th Cir. 2007)........................................................24

*\*United States v. Campa,*
  529 F.3d 980 (11th Cir. 2008).................................... 20, 30, 39, 50, 51

*United States v. Carter,*
  776 F.3d 1309 (11th Cir. 2015)........................................................28

*United States v. Carthen,*
  906 F.3d 1315 (11th Cir. 2018)........................................................26

*United States v. Corrigan,*
  144 F.3d 763 (11th Cir. 1998).........................................................53

*United States v. Dumeisi,*
  424 F.3d 566 (7th Cir. 2005)..........................................................39

*\*United States v. Duran,*
  596 F.3d 1283 (11th Cir. 2010)...................19, 38, 40, 41, 42, 43, 44, 55

*United States v. Ettinger,*
  344 F.3d 1149 (11th Cir. 2003).......................................................39

*United States v. Feola,*
  420 U.S. 671 (1975)..................................................................38

**Cases (cont'd)** <u>Page(s)</u>

*United States v. Gonzalez,*
  975 F.2d 1514 (11th Cir. 1992)......................................48, 49

*United States v. Hasson,*
  333 F.3d 1264 (11th Cir. 2003)............................................22

*United States v. Hill,*
  799 F.3d 1318 (11th Cir. 2015).......................................45, 48

*United States v. Holland,*
  117 F.4th 1352 (11th Cir. 2024).....................................25, 35

*United States v. Isaacson,*
  752 F.3d 1291 (11th Cir. 2014)............................................52

*United States v. Jimenez,*
  972 F.3d 1183 (11th Cir. 2020)......................................21, 22

*United States v. Keen,*
  676 F.3d 981 (11th Cir. 2012)..............................................28

*United States v. Margarita Garcia,*
  906 F.3d 1255 (11th Cir. 2018)............................................62

*United States v. McNair,*
  605 F.3d 1152 (11th Cir. 2010)............................................59

*United States v. Phillips,*
  19 F.3d 1565 (11th Cir. 1994)..............................................39

*United States v. Rafiekian,*
  991 F.3d 529 (4th Cir. 2021)........................................31, 32

*United States v. Reeves,*
  742 F.3d 487 (11th Cir. 2014)......................................37, 38

*United States v. Richardson,*
  532 F.3d 1279 (11th Cir. 2008).....................................19, 46

*United States v. Rivera,*
  780 F.3d 1084 (11th Cir. 2015)............................................37

*United States v. Siegelman,*
  640 F.3d 1159 (11th Cir. 2011)............................................26

**Cases (cont'd)**                                                          Page(s)

*United States v. Stone,*
   139 F.3d 822 (11th Cir. 1998)................................................................37

*United States v. Underwood,*
   446 F.3d 1340 (11th Cir. 2006).........................................................25

*United States v. Wenxia Man,*
   891 F.3d 1253 (11th Cir. 2018)..........................................................27

*United States v. Wheeler,*
   16 F.4th 805 (11th Cir. 2021) ...........................................................36

*United States v. White,*
   837 F.3d 1225 (11th Cir. 2016)...................................................... 40, 41

*United States v. Williams,*
   553 U.S. 285 (2008)...........................................................................51

*Yates v. United States,*
   354 U.S. 298 (1957)...........................................................................51

**Statutes and Regulations**

18 U.S.C. § 3231 ........................................................................................2

18 U.S.C. § 951(d)................................................................................ 32, 57

22 U.S.C. § 611(c) ...................................................................................57

22 U.S.C. § 618(a) ...................................................................................57

28 U.S.C. § 1291 ........................................................................................2

28 C.F.R. § 5.200 ......................................................................................57

28 C.F.R. § 73.6 ................................................................................... 56, 57

**Other Authorities**

*Control*, Webster's Third New International Dictionary 496 (2002) .....32

*Direction*, Webster's Third New International Dictionary 640 (2002)...32

Eleventh Cir. Pattern Jury Instr. O13.1 .........................................29, 35

Restatement (Second) §§ 2 cmt. b, 14N, 220 cmt. e...............................32

## INTRODUCTION

In 2015 the defendants began a relationship with Alexander Ionov, an asset of Russia's Federal Security Service. Ionov would later describe it as a "bilateral cooperation program," and the defendants would call it an alliance. The defendants recognized that Russia's goal was for them to act as "forces" inside the United States working to sow division in our country. In the years that followed, and with Ionov's guidance and funding, they did so. They were charged with acting as agents of Russia without notifying the Attorney General, in violation of 18 U.S.C. § 951, and with conspiring to do so, in violation of 18 U.S.C. § 371. After a trial, the defendants were convicted of conspiring to violate Section 951 but were acquitted of the substantive Section 951 charge.

As a result, this case now presents only straightforward issues regarding the law of conspiracy. The district court did not err with respect to these issues, applying settled law to reject the defendants' attempts to redefine the crime of conspiracy. The remaining questions regarding the First Amendment and the scope of Section 951 are far narrower than the defendants suggest, and the district court correctly resolved them in any event. This Court should affirm.

1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The court entered its judgment with respect to Augustus Romain, Jr., on December 9, 2024, and he filed a timely notice of appeal on December 11, 2024. 1A:34.[1] The court entered its judgments with respect to the other defendants on December 16, 2024, and amended judgments on December 19, 2024. 1A:35. Those defendants filed timely notices of appeal between December 18 and 20, 2024. *Id.* This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] References to the appendix filed by Yeshitela, Hess, and Nevel take the form [Volume]A:[pages(s)]. These defendants' brief is cited as "Br.", with parallel citations to the brief filed by Romain ("Romain Br.") where appropriate.

## ISSUES PRESENTED

1. Whether the government presented sufficient evidence that the defendants conspired to violate 18 U.S.C. § 951.

2. Whether the district court abused its discretion in instructing the jury by:

    a. rejecting the defendants' argument that a conspiracy conviction requires proof that the underlying offense was also completed;

    b. using the Eleventh Circuit Pattern Jury Instruction statement that a conspiracy "is a kind of criminal partnership;"

    c. concluding that this Court's interpretation of 18 U.S.C. § 951 in *United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010), remains good law and instructing the jury accordingly; or

    d. rejecting the proposed instruction by Yeshitela, Hess, and Nevel that claimed Romain's conduct was irrelevant to them.

3. Whether the defendants' conspiracy conviction violates the First Amendment.

4. Whether the district court plainly erred in not declaring a mistrial in response to two questions regarding a defense exhibit asked during the prosecutor's re-direct examination.

3

## STATEMENT

Over the course of several years, the defendants formed a close relationship with Alexander Ionov and his front organization, the Anti-Globalization Movement of Russia (AGMR). This relationship was mutually beneficial: The defendants gained media exposure and funding, while Russia advanced its goal of utilizing forces within the United States to sow division. Crucial to achieving the latter goal, however, was that Russia's involvement remain hidden. At no point during this relationship did any of the defendants notify the Attorney General of the United States that they were acting as agents of the Russian government. *See* 11A:1994-96.

### A. The Defendants' Relationship With Ionov and AGMR

The defendants all worked as part of the African People's Socialist Party (APSP). Omali Yeshitela was the founder and chairman of APSP. 5A:957. Penny Hess and Jesse Nevel were members of APSP's African People's Solidarity Committee, with Hess serving as its chair. 5A:966. Augustus Romain, Jr., was a senior member of APSP before he left the group to form his own organization called Black Hammer. *See* 5A:966; 12A:2216.

4

Alexander Ionov was an asset of Russia's Federal Security Service (FSB). *See* 6A:1036. The defendants recognized that Ionov's organization, AGMR, was a tool of the Russian government. 13A:2303. Ionov spoke frequently with FSB officers Yegor Popov and Aleksey Sukhodolov and regularly submitted reports to them on his activities and those of AGMR. 6A:1071-79.

In May 2015, Ionov invited the defendants, through APSP, on an all-expenses paid trip to Russia. 6A:1223. Ionov offered it as an opportunity "to meet with [the Russians] and to communicate on future cooperation." 6A:1225. The defendants accepted the invitation as "an amazing opportunity to meet with [their] Russian comrades and international media." 6A:1224. Yeshitela traveled to Russia that month. 6A:1228.

By July 2015, Ionov and the defendants had formed a "[d]eepening relationship overall," such that they were "in touch almost every day." 5A:966. Ionov was inquiring about upcoming APSP events and how he might transfer money to the defendants. 6A:1233-34. In response, Hess was providing him "expenses and prices for actions" that APSP was considering. 6A:1235. Ionov initially pledged to donate $500 to APSP

5

and by the end of 2015 he had provided $1500 to the defendants. *See* 5A:982; 12A:2238.

In September 2015, Yeshitela returned to Russia, again with all expenses paid by Ionov and AGMR. 5A:984-85. While he was there, the defendants exchanged among themselves news articles that detailed Ionov and AGMR's close ties to the Russian government. *See* 13A:2295-98. Upon his return, Yeshitela summarized the trip for the other defendants, describing it as "important" and "more eventful than one might have initially thought it would be." 13A:2301. In particular, he noted that the "Anti-Globalization Movement of Russia is a solid institution of Russian politic," and that "it is clear that it is [an] instrument of Russian government." 13A:2303. "This does not disturb us," Nevel wrote in his notes of the meeting. 13A:2303. Overall, Yeshitela concluded that "[APSP] ha[s] interests, Russia has interests, we recognize that and that is the basis of our relationship." 13A:2302.

Yeshitela's cover email for his summary of the trip reinforced many of these same themes:

> In attending the AGM conference, we did so recognizing that the Anti-Globalization Movement of Russia (which more than likely represents a method by which the Russian

6

Government is engaging the U.S. and Europe in serious struggle) is carrying out its own agenda – to utilize forces inside of the U.S. to sow[2] division inside the U.S. Likewise, our Party is clear that we also have our agenda – to place the question of African self-determination on the world's agenda and to win international allies for our National Liberation Struggle.

13A:2304-05.

In October 2015, Hess suggested that they should "[b]ring Alex [Ionov] to St Pete to see the institutions [and to] see that supporting this will contribute to [the Russians'] efforts to undermine influence of United States in contests that they are engaged in." 13A:2315. As Hess explained, "What's motivating the Russians is their contest with U.S. imperialism," and APSP should "[l]everage the relationship with the Russians to build other things—to gear towards reparations." 13A:2315.

Over the course of this relationship, the defendants continued to characterize their relationship with Ionov and AGMR in similar terms. For example, in February 2016, during a payment dispute with Ionov, Yeshitela wrote that "it must be understood that we entered this relationship with the Anti-Globalization Movement of Russia as allies,

---

[2] In the original exhibit, this word is misspelled as "sew."

7

not employees." 10A:1811. Likewise, the defendants explained that they took certain actions because they had "developed a relationship with forces in Russia who are involved in their own struggle with the U.S." 10A:1832. Nonetheless, Yeshitela recognized that the "Russians have to justify their getting resources for this [and] [t]hey want information [regarding APSP's activities] to work with." 10A:1833.

**B. The Defendants' Actions on Behalf of Russia**

Over the course of several years, the defendants undertook a variety of actions guided and funded by Ionov and AGMR.

UN Genocide Petition: In July 2015, Ionov and AGMR instructed Hess to prepare a "UN petition on genocide of African people in U.S." 6A:1239. They directed that the petition "should be written ASAP," that it should be "sent to [the] UN office in New York," and that it should be posted publicly "to the websites of [the] White House and change.org." 6A:1242. Ionov needed the defendants to be the ones to submit it, explaining that, "[a]fter all, we are not exactly black to demand it for ourselves." 6A:1241. The petition was posted shortly thereafter, and Hess confirmed to AGMR and Ionov that "the petition and a cover letter

8

were sent to the Secretary General Ban Ki-Moon and to the entire General Assembly tonight electronically." 6A:1243-44.

Tent Encampment: At the start of 2016, the Russians proposed that APSP stage "a tent city" event tied "to the Africans Charge Genocide campaign." 13A:2323-24. According to the defendants' internal meeting notes, the defendants had "support from the Russians" for the campaign, and the Russians would "fund the tents and other expenses." 13A:2324. Specifically, Ionov agreed to provide $12,000 to APSP "for organization of [a] four-city tour from 22 to 29 January, 2016." 13A:2327. In a letter to AGMR, Hess thanked Ionov for his "leadership in envisioning such actions." 13A:2326. The campaign took place as scheduled, and Yeshitela explained that they undertook it because Ionov and AGMR "wanted to see a big mobilization around the genocide question." 13A:2334. Although Ionov later resisted providing the promised funding, he eventually transferred approximately $7,000 to APSP in connection with the campaign. *See* 12A:2238.

Pro-Russian Publications: Throughout 2016, Ionov and AGMR repeatedly requested that the defendants draft and publish articles on topics he dictated and with perspectives favorable to Russia. For

example, in May 2016, AGMR tasked Hess with publishing articles on Russian citizens who, according to Ionov and AGMR, were illegally detained in the United States. *See* 13A:2347 (sending Hess articles about convicted arms trafficker Viktor Bout and others). Similarly, shortly after Russian Olympic athletes were banned for using performance-enhancing drugs, Ionov and AGMR tasked the defendants with making a statement "in support of [the] Russian Olympic team and Thomas Bach, the President of IOC who advocated [for] the admission of Russian athletes to Rio Olympics" and asked if "this statement [can] appear on your website or FB page." 13A:2349-50. The defendants complied. *See, e.g.*, 13A:2351-52.

Ukraine Information Campaign: In May of 2020, Yeshitela received a "request from Russia" that he and APSP "record a short video" recognizing the sixth anniversary of the Donetsk People's Republic—a Russia-backed separatist entity in Eastern Ukraine. 13A:2385-86. Again, the defendants complied. See 13A:2387. In turn, Ionov submitted a report to his FSB handlers about Yeshitela's video. *See* 13A:2389-90 (noting that the videos were "broadcast on outdoor screens in the center of Donetsk").

10

In February 2022, with a focus on Russia's recent invasion of Ukraine, Ionov held "emergency phone talks" with organizations in the United States, including APSP (represented by Nevel). 13A:2398. In a subsequent phone call with Yeshitela, Ionov requested that Yeshitela and APSP "support Russia in the information war unleashed by the West." 13A:2403. In the weeks that followed, the defendants hosted several video conferences featuring Ionov providing pro-Russian perspectives on the war. *See* 13A:2403-06. At the same time, Ionov also directed Yeshitela to "make an official statement on the situation and show support for Russia," which Yeshitela did. 13A:2404. Ionov again submitted reports on this activity to his Russian government handlers at the FSB. 13A:2404.

Social Media Protests: In the weeks after Russia's invasion of Ukraine, Ionov leveraged his partnerships with Romain and Yeshitela to have each of them use their organizations[3] to stage protests at the

---

[3] Romain left APSP in 2018. See 12A:2216. He then formed a new organization called Black Hammer and continued his relationship with Ionov. *See* 12A:2262.

11

social media company Meta. The protests' purpose was to end alleged censorship of Russia by Meta on Facebook. 7A:1298; 13A:2408.

With respect to Romain and his organization Black Hammer, Ionov paid for the protestors' travel and accommodations and even created the signs they used at the protest. 13A:2407-10. Romain and Black Hammer made some alterations to the posters "so they look more organic" and carried out the protest. 13A:2413-14. Ionov congratulated them on "[o]ur first joint action" and reported back on the activity to his FSB handlers. 7A:1293, 13A:2411. Then, from May through July 2022, Ionov tasked and directed Romain to stage protests at CNN to mark Russia's Victory Day celebration and at the Georgia State Capitol to oppose the provision of aid to Ukraine. *See* 7A:1305-07. Romain carried out both directives. *See* 7A:1308-09.

With respect to APSP, Ionov directed APSP to organize a protest at Meta and to do it as soon as possible. *See* 7A:1294-97. Ionov detailed his expectations in a call with Yeshitela. Immediately after that call, Yeshitela convened an "urgent meeting" with APSP leadership, including Hess, to begin organizing the protest. 7A:1296. Hess and the other APSP leaders supported the plan and carried it out. 7A:1298-99.

12

## C. Proceedings Below

The operative indictment charged Defendant-Appellants Yeshitela, Hess, and Nevel with acting as agents of the Russian Federation and its officials, without notifying the Attorney General, in violation of 18 U.S.C. § 951(a). *See* 1A:79-80. It also charged these defendants, along with Defendant-Appellant Romain, with conspiring to violate Section 951. *See* 1A:45-78. Ionov and two of his FSB handlers (Popov and Sukhodolov) were also charged as part of the conspiracy, *see id.*, but remain at large.

Before trial, the defendants moved to dismiss the indictment, arguing that the charges violated the First Amendment. *See* 1A:82-110. Their motion highlighted certain overt acts alleged in the indictment that they claimed "relate to political speech and peaceable assembly." 1A-91. The defendants argued that the First Amendment protected their speech, regardless of whether it was directed by Russia and regardless of whether they disclosed this by notifying the Attorney General. *See* 1A-97-98. Separately, they claimed that "[t]he fact that Section 951 contains a registration requirement to avoid criminal

13

prosecution does not save this indictment," 1A:104-06, and that Section 951 was unconstitutionally overbroad, 1A-107-09.[4]

The magistrate judge recommended that their motion be denied, because "Section 951 is not unconstitutional as applied under an intermediate scrutiny standard." 1A:205. The district court adopted the report and recommendation in full. 2A:307. The opinion explained that this Court has already held that "Section 951 applies 'whether the action [taken on behalf of a foreign government] is legal or not.'" 1A:206 (quoting *United States v. Duran*, 596 F.3d 1283, 1295 (11th Cir. 2010)). The court distinguished between merely publishing articles and doing so "at the direction of a foreign government," a key distinction "that moves the needle into the authority of Section 951." 1A:209. And because Section 951 is content-neutral, the court found that intermediate scrutiny was appropriate. *See* 1A:213-16. The court held that Section 951 meets that standard because it "furthers substantial government interests that are unrelated to the suppression of free

---

[4] The defendants appear to have abandoned these aspects of their argument on appeal. *Compare* Br. 18-24 (discussing *De Jonge v. Oregon*, 299 U.S. 353 (1937), and *Meyer v. Grant*, 486 U.S. 414 (1988)) *and* 1A:92-103 (same) *with* 1A:104-09.

speech" and its notification requirement "is narrowly drawn." 1A:216-17.

The defendants' jury trial took place in September 2024. FBI Special Agent Iry Drupp testified about documents obtained from the defendants' electronic accounts that showed the defendants' first interactions with Ionov, including Yeshitela's trips to Russia and his reports after returning. 5A:962-67, 984-999. These documents also traced the defendants' discussions with Ionov about the genocide petition submitted to the United Nations, 5A:969-81, and their discussions about the tent encampment, 10A:1797-1833. The jury also saw evidence of Ionov's payments to the defendants. 5A:982-83, 6A:1236.

Special Agent Anna Myers, a native Russian speaker, testified regarding documents obtained from Ionov's and Popov's accounts. These documents confirmed the defendants' conclusion that Ionov was in fact working on behalf of the Russian government. *See, e.g.*, 6A:1036 (Ionov's certificate of merit from the FSB Director). They also identified Popov and Sukhodolov as FSB officers. *See, e.g.*, 6A:1056-58 (Popov's duty rosters); 6A:1067 (Sukhodolov's visa application). And the documents

included many of Ionov's reports to these FSB officers, *see, e.g.*,

6A:1071-79, 1097, such as when he described the relationship with the

defendants as a "bilateral cooperation program," 11A:1960. Finally,

these documents reflected payments from the FSB to Ionov for his work.

*See, e.g.*, 6A:1080, 1084.

Professor Thomas Rid explained to the jury the "active measures"

that Russia's intelligence agencies employ. He told the jury:

> Active measures has four parts, four components: First,
> these are secret professional operations, campaigns; second,
> they usually have a political objective; third, they exploit
> existing divisions; and fourth, they manipulate information.

6A:1126. He noted that Russia has exploited a variety of existing

divisions within American society, such as anti-Semitism,

environmental activism, and nuclear weapons, all with the goal of

"turn[ing] a society against itself and . . . mak[ing] it weaker in the

process." 6A:1129.

Finally, Special Agent Kelly Bowen walked the jury through the

FBI's investigation of the defendants. She prepared summary exhibits

collecting the evidence related to the defendants' trips to Russia, as well

as each of their major activities coordinated with Ionov. And she

16

explained that when the defendants were arrested, Ionov urgently reported this to his FSB handlers along with the instruction: "Trash the phones." 7A:1318.

At the close of the government's evidence, the defendants moved for a judgment of acquittal, which the district court denied. 8A:1357. They then introduced several APSP documents as exhibits in their defense. *See* 8A:1361-74. With respect to the conspiracy charge, the jury received an instruction that largely tracked Eleventh Circuit Pattern Jury Instruction O13.1. *See* 8A:1505-08. After two days of deliberation, the jury found the defendants not guilty of violating Section 951, but guilty of conspiring to do so. 8A:1545-48. The district court denied the defendants' post-trial motions. 5A:844-46. The court sentenced Romain to 60 months of probation and the other defendants to 36 months of probation each. *See* 1A:34-35.

17

**SUMMARY OF ARGUMENT**

A jury found the defendants guilty of conspiring to violate 18 U.S.C. § 951. Although they offer a host of arguments challenging that result, none have merit. This Court should affirm their convictions.

Initially, the government provided sufficient evidence to support the jury's guilty verdict. The defendants' own words confirmed their partnership with Ionov as well as their recognition that he and his organization were tools of the Russian government. And what Russia sought from that partnership—for the defendants to act as forces working inside the U.S. to sow division in our country—confirms that the partnership had a criminal purpose. *See* 5A:997-98. The defendants explicitly acknowledged that Russia needed to justify the funding it provided to the defendants. *See* 10A:1833. The defendants provided that justification by agreeing to act surreptitiously as agents of Russia. From this evidence, a rational jury could conclude that the defendants conspired to violate 18 U.S.C. § 951. And for the same reason, the district court did not abuse its discretion in admitting statements by Ionov and his handlers under the co-conspirator exception to the hearsay rule.

18

Faced with this evidence, the defendants offer a variety of arguments attempting to redefine the crime of conspiracy as it was explained in the jury instructions. Binding precedent largely forecloses these claims. The Supreme Court has repeatedly rejected the idea that conspiracy requires proof that the underlying crime was accomplished. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 65 (1997). And the Eleventh Circuit's pattern jury instruction that a conspiracy "is a kind of 'partnership' for criminal purposes" is not erroneous; it also draws from long-established law. *See, e.g.*, *Pinkerton v. United States*, 328 U.S. 640, 644 (1946). Likewise, this Court has repeatedly rejected the claim that Section 951 violations require proof of knowledge of the notification requirement. *See, e.g.*, *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010). Finally, the claim by Yeshitela, Hess, and Nevel that the jury was mis-instructed about the significance of Romain's actions is merely a disguised request for this Court to second-guess the jury's finding of a single conspiracy. *See United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). Thus, no abuse of discretion occurred.

The defendants' conspiracy conviction also does not violate the First Amendment. Initially, the jury's verdict substantially narrows the

19

question before this Court. The defendants focus on the First Amendment's applicability to the charged overt acts, but this focus is misplaced. Even if some overt acts were protected activity, an overt act "can be innocent in nature, provided it furthers the purpose of the conspiracy." *United States v. Campa*, 529 F.3d 980, 1002 (11th Cir. 2008) (internal quotation marks omitted). To the extent the Court does reach the defendants' First Amendment challenge to Section 951, the statute satisfies intermediate scrutiny. The Supreme Court's rejection of a nearly identical challenge to the Foreign Agents Registration Act confirms that the defendants' proffered cases applying strict scrutiny are inapposite. *See Meese v. Keene*, 481 U.S. 465 (1987).

Finally, the claim of prosecutorial misconduct by Yeshitela, Hess, and Nevel is doubly flawed. First, none of the testimony they cite was false. Rather, it closely tracked their own exhibit, introduced during the cross-examination of Special Agent Bowen. Second, the defendants cannot meet the high bar of showing that the district court plainly erred in failing to order a mistrial. The testimony was an isolated segment of an eight-day trial and was never again mentioned by the government.

# ARGUMENT

## I. SUFFICIENT EVIDENCE SUPPORTED THE DEFENDANTS' CONSPIRACY CONVICTIONS

### A. The Defendants' Own Words Confirm Their Criminal Conspiracy to Violate Section 951

"When a defendant has challenged the sufficiency of the evidence by an appropriate motion for judgment of acquittal, [the Court] review[s] de novo whether there was sufficient evidence to support a conviction." *United States v. Jimenez*, 972 F.3d 1183, 1190 (11th Cir. 2020). The Court "view[s] the record in the light most favorable to the government, resolving all reasonable inferences in favor of the verdict," and "assume[s] that the jury made all credibility choices in support of the verdict." *Id.* Then, the Court asks only "if a reasonable jury could find that the evidence established the defendant's guilt beyond a reasonable doubt." *Id.* "A split verdict is further evidence that the jury considered the charges carefully and individually, addressed the strength of the evidence on each charge, and reached a reasoned conclusion." *United States v. Bell*, 112 F.4th 1318, 1334 (11th Cir. 2024) (internal quotation marks omitted).

21

"To prove a conspiracy under 18 U.S.C. § 371, . . . the government must show: '(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement.'" *Jimenez*, 972 F.3d at 1190-91 (quoting *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003)). Here, the defendants appear to challenge the sufficiency of the evidence with respect to only the first element. *See* Br. 25; Romain Br. 28.

The defendants' own words confirm that they formed an agreement among themselves and with Ionov. *See, e.g.*, 10A:1832 (meeting minutes noting that the "Party developed a relationship with forces in Russia"); 10A:1811 (Yeshitela noting in an email that the defendants "entered th[e] relationship with [AGMR] as allies, not employees"). Ionov's reports to the FSB confirm as much, describing the relationship as a "bilateral cooperation program." 11A:1960; *see also* 8A:1417 (defense, admitting in closing, "They had a partnership. They had a bilateral cooperation, partnership."); Br. 37 (stating it was "never disputed" that the defendants "partnered with Ionov").

22

Instead, the defendants suggest that their agreement with Ionov was to perform only lawful activities rather than to violate Section 951. But the government presented sufficient evidence from which the jury could reject the defendants' attempt to recast their relationship with Ionov and Russia. As Yeshitela acknowledged from the outset, Russia's goal was "to utilize forces inside the U.S. to sow division inside the U.S." 5A:997-98. Yeshitela told Ionov that they could "base [their] unity on what [their] interests are, traveling towards realizing [their] interests." 5A:995. Later, Yeshitela confirmed that Russia was seeking to capitalize on its side of the arrangement. *See, e.g.*, 10A:1833 (noting while seeking reimbursement for the tent encampment that the "Russians have to justify their getting resources for this"). The jury reasonably concluded that this was accomplished through the illegal plan for the defendants to act surreptitiously in the United States as agents of Russia. *See* 6A:1241 (Ionov explaining that he could not submit the genocide petition).

The fact that the defendants also had their own goals and sought to benefit from the arrangement does not alter the analysis. *Contra* Br. 27-29; Romain Br. 30-31. Indeed, members of a conspiracy almost

23

always seek to benefit in ways separate from the conspiracy's goals, whether by seeking a cut of the proceeds from a drug conspiracy, enjoying less competition in an antitrust conspiracy, or tasting revenge in a murder conspiracy. The fact that the defendants could simultaneously use Russian resources to "move their agenda and movement forward," Br. 27 (citation modified), shows their motive to join the conspiracy, not their innocence.

At most, the defendants are attempting to have this Court second-guess the jury's decision to reject their claims about the scope of their agreement with Ionov and Russia. *See also* Part II.A (discussing the defendants' erroneous view of "direction or control"). But "[s]ufficiency review operates as a backstop to protect the defendant's due process rights, not as a license for the court to second-guess the jury." *United States v. Browne*, 505 F.3d 1229, 1262 (11th Cir. 2007). Here, the defendants' own words provided ample evidence from which the jury could conclude that the defendants agreed to violate Section 951.

24

### B. Relying on this Evidence, the District Court Correctly Overruled the Defendants' Hearsay Objection

The defendants also challenge the district court's decision to admit Ionov's statements to his FSB handlers under Federal Rule of Evidence 801(d)(2)(E). *See* Br. 30-31; Romain Br. 31-33. "Determinations of the admissibility of evidence are in the discretion of the trial judge and will not be reversed by an appellate court unless it finds an abuse of discretion." *United States v. Underwood*, 446 F.3d 1340, 1345 (11th Cir. 2006). Because the government presented sufficient evidence to support the defendants' conspiracy conviction, it logically follows that there was no abuse of discretion in the district court's finding that the co-conspirator exception to the hearsay rule applied to Ionov's statements. *See United States v. Holland*, 117 F.4th 1352 (11th Cir. 2024) (noting that the rule applies even to conspiracies without an illegal object).

"A court may admit evidence under Rule 801(d)(2)(E) if the government prove[s] by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy."

25

*United States v. Carthen*, 906 F.3d 1315, 1320 (11th Cir. 2018) (internal quotation marks omitted). As explained above, the government provided ample evidence that the defendants and Ionov formed a conspiracy for the defendants to act as agents of Russia without notifying the Attorney General.

The defendants assert that none of this evidence was "independent" of Ionov's statements. *See* Br. 30; Romain Br. 32. This claim ignores the defendants' own statements acknowledging that they were "allies" with AGMR and that Russia's goal was for them to act as "forces inside the U.S. to sow division inside the U.S." 5A:997-98. These statements provide any additional connection necessary for the district court to conclude that a conspiracy existed and that it included Ionov.

The defendants are also wrong in claiming that Ionov's statements "did not further any conspiracy with" them. *See* Br. 31; Romain Br. 32. "This court applies a liberal standard in determining whether a statement was in furtherance of a conspiracy." *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011). "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." *Id.* (internal quotation marks omitted)

"For example, statements that could have been intended to affect future dealings between the parties, that provide reassurance, that serve to maintain trust and cohesiveness, or that inform other conspirators of the current status of the conspiracy satisfy this standard." *United States v. Wenxia Man*, 891 F.3d 1253, 1271 (11th Cir. 2018) (citation modified). Ionov's reports to his FSB handlers fall comfortably within this scope, informing his handlers of the status of his interactions with the defendants and receiving guidance as to how he should further direct them.

Finally, the defendants attempt to twist the rule that "[o]ne cannot enter a conspiracy with a government agent or informant who aims to frustrate the conspiracy" to apply to Ionov. *See* Br. 31 (internal quotation marks omitted); Romain Br. 32-33 (same). Ionov was never an agent of the *United States* government, and the rule plainly does not apply to agents of foreign governments working to conceal their operations from American criminal investigators. *See* 7A:1318 (Ionov telling Popov, "Trash the phones."). Likewise, even if it was true that Ionov felt his handlers were "ruining" APSP, this is not the same as "aim[ing] to frustrate *the conspiracy*." *See United States v. Keen*, 676

27

F.3d 981, 994 (11th Cir. 2012) (emphasis added) (finding statements of a co-conspirator were admissible even after he provided partial tips about the activity to the FBI). At most, Ionov's comment reflects a strategic disagreement about how Russia could best continue to use the defendants to further the conspiracy's goals by allowing APSP to retain a veneer of legitimacy. There was therefore no abuse of discretion in the admission of Ionov's statements to his FSB handlers.

## II. THERE WAS NO ABUSE OF DISCRETION IN THE JURY INSTRUCTIONS

Faced with this evidence, the defendants scatter throughout their brief claims that the jury was improperly instructed about what it needed to find in order to convict them. The Court reviews "*de novo* the legal correctness of jury instructions," but "defer[s] to the district court on questions of phrasing absent an abuse of discretion." *United States v. Carter*, 776 F.3d 1309, 1323 n.11 (11th Cir. 2015). As explained below, this Court should reject the defendants' attempts to alter or add to the elements of the crime defined in 18 U.S.C. § 371.

28

## A. The Jury Was Correctly Instructed on the Elements of Conspiracy

The defendants claim that the jury should have been instructed "that they have to find the elements of the § 951 violation to find the conspiracy." Br. 36 (cleaned up); Romain Br. 38 (same). This premise underlies their lengthy discussion of whether the government in fact proved the Section 951 charge, *see* Br. 25-30; Romain Br. 28-31, because (in their view) whether "the defendants were under direction or control of Russia [was] an essential element of the conspiracy charge," Br. 30; Romain Br. 31. The defendants offer no legal support for this assertion, however. As explained below, it is contrary to well-established conspiracy law.

Here, the jury was instructed using language that closely tracked Eleventh Circuit Pattern Jury Instruction O13.1. Jurors were told that Count 1, alleging a violation of 18 U.S.C. § 371, had four elements:

> 1. Two or more persons in some way agreed to accomplish a shared and unlawful plan;
>
> 2. The defendant knew the unlawful purpose of the plan and willfully joined in it.
>
> 3. During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment.

29

And 4. The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

8A:1507. The instructions also explained that "[t]he elements of this crime alleged to be the object of the conspiracy are set forth on [later pages] in your jury instructions." 8A:1506.

The defendants' claim that "the elements of the object of the conspiracy" were "necessary to convict" on the conspiracy charge, Br. 37; Romain Br. 38, is contrary to long-established law. To obtain a conspiracy conviction, "[t]he government does not need to prove that the defendants accomplished the purpose of the conspiracy." *United States v. Campa*, 529 F.3d 980, 1002 (11th Cir. 2008). This is because "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946). "It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas v. United States*, 522 U.S. 52, 65 (1997).

Given these long-established principles, it is unsurprising that the defendants have provided no legal support for their contrary jury

30

instruction. *See* Br. 30, 36 (offering no supporting citations); Romain Br. 31, 38 (same). The district court therefore did not abuse its discretion when it rejected the defendants' attempt to turn the object of a conspiracy into a lesser included offense of the conspiracy charge. *See United States v. Baston*, 818 F.3d 651, 663 (11th Cir. 2016) (A district court is "under no obligation to give a requested instruction that misstates the law.") (internal quotation marks omitted).

Because the defendants' conspiracy conviction did not require the government to also prove a violation of Section 951, this Court does not need to opine on the nuances of the latter offense. Nonetheless, the government notes that throughout their briefs, the defendants take an unduly narrow view of what constitutes "act[ing] . . . as an agent of a foreign government" under Section 951. *See, e.g.*, Br. 26-27 (discussing *United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021)); Romain Br. 29-30 (same). The defendants make the same mistake that the Fourth Circuit corrected in *Rafiekian*, incorrectly suggesting that Section 951 "require[s] something akin to an employer-employee relationship." 991 F.3d at 540. Thus, they contend (at 28) that Yeshitela's claim that the defendants' relationship with AGMR was one of "allies, not employees,"

31

is exonerating. "But an independent contractor may also be an agent—while still retaining significant discretion over the particulars of performance—so long as he 'contracts to act on account of the principal.'" *Rafiekian*, 991 F.3d at 540 (quoting Restatement (Second) §§ 2 cmt. b, 14N, 220 cmt. e).

Likewise, "that defendants were under no obligation" to agree to Ionov's plans, Br. 29, merely shows that they entered the conspiracy willingly. "[T]he term 'agent of a foreign government' means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). Giving these terms their plain meaning, an agent of a foreign government is anyone who agrees to act subject to a foreign government's "guidance or supervision of action, conduct, or operation" or its "power or authority to guide or manage." *Direction*, Webster's Third New International Dictionary 640 (2002); *Control, id.* at 496. The fact that the conspiracy was mutually beneficial is therefore no defense. While the defendants hoped to gain additional media exposure and funding, the benefit to Ionov was precisely his ability to provide "guidance or supervision of action" and "guide or manage" the activities

32

that the defendants would undertake, without those actions being publicly attributed to Russia.

This also explains why the defendants' reliance on their cross-examination of the FBI agents is misplaced. *See* Br. 29-30; Romain Br. 31. Ionov spoke with the defendants with varying degrees of assertiveness, but the necessary "direction or control" can be provided through a question or a polite statement, as well as an irresistible command. So long as a defendant subjects himself to that guidance and thereby acts as an agent, the statute applies. The government witnesses' responses to questions about Ionov's assertiveness are therefore beside the point.

As noted above, the Court does not need to decide whether any particular exchange with Ionov embodied the necessary "direction or control" to affirm the defendants' conspiracy conviction. To the extent the Court chooses to address the defendants' arguments about the scope of Section 951, it is sufficient that their criminal agreement with Ionov encompassed the necessary "direction or control," regardless of whether it ever manifested in a substantive violation of Section 951.

### B. The Jury Was Correctly Instructed that a Conspiracy Is a Kind of "Partnership for Criminal Purposes"

Following the Eleventh Circuit's pattern instruction, the jury was also instructed that "[a] 'conspiracy' is an agreement by two or more people to commit an unlawful act. In other words, it's kind of a 'partnership' for criminal purposes." 8A:1506. On appeal, the defendants now claim that this instruction "wrongly suggest[ed] to the jury that it should convict defendants of conspiracy if it found that they partnered with Ionov, a fact that was never disputed." Br. 37. They further claim that by "urg[ing] the jury to convict based on entirely innocent conduct of partnering with a foreign national," the prosecutor "misstate[d] the law . . . to produce wrongful convictions." Br. 38; Romain Br. 39. The Court should reject this claim, too, as contrary to well-established law.

Contrary to the defendants' implication, the jury was not instructed that "partnering" is criminal; it was correctly instructed that partnering "for criminal purposes" is, as a conspiracy is an agreement "to commit an unlawful act." 8A:1506. Nearly 80 years ago, the Supreme Court stated succinctly: "A conspiracy is a partnership in

34

crime." *Pinkerton*, 328 U.S. at 644. Entering into such a criminal partnership carries consequences. For example, "so long as the partnership in crime continues, the partners act for each other in carrying it forward." *Id.* at 646. That a conspiracy is a kind of criminal partnership also gave rise to the co-conspirator exception to the hearsay rule, as this Court has explained:

> The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them.

*Holland*, 117 F.4th at 1357 (quoting *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917)). Unsurprisingly, then, this Court's pattern conspiracy instruction reflects that well-established principle. *See* Eleventh Cir. Pattern Jury Instr. O13.1. The district court's use of that instruction was not an error.

The defendants offer nothing to support their contrary claim that the jury instruction here "misstated the law." Br. 36; Romain Br. 38.

Indeed, other than a citation to the standard for evaluating prosecutorial arguments, the pertinent section of their brief does not cite any authority at all. *See generally* Br. 36-38 (citing only *United States v. Wheeler*, 16 F.4th 805 (11th Cir. 2021)); Romain Br. 38-39 (same). The defendants instead appear to suggest that there is something unique about the crime they were conspiring to commit that should change the definition of a conspiracy. *See* Br. at 37 (acknowledging that "[t]his language makes sense when the object of the conspiracy is a crime like fraud or drug distribution"); Romain Br. 38 (same). The Court should decline to invent a gerrymandered exception to the crime of conspiracy that would immunize (apparently) only the defendants' conduct.

Even if there were error in the pattern instruction, the doctrine of invited error would preclude the Court from addressing it here. *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) ("We are precluded, however, from reviewing an issue raised on appeal if it has been waived through the doctrine of invited error."). "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Stone*, 139 F.3d 822, 838

(11th Cir. 1998). Here, any error in the district court's instruction that a conspiracy is "a kind of 'partnership' for criminal purposes" was invited because the defendants themselves asked for this instruction. *See* ECF 260-1 at 21.

Additionally, the prosecutor's argument was not misleading when it urged the jury, without objection, to conclude that a conspiracy existed from the defendants' own description of the relationship between APSP and Ionov as an alliance. "[A]lthough a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). Additionally, "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *id.* (internal quotation marks and citations omitted); *see also United States v. Rivera*, 780 F.3d 1084, 1100 (11th Cir. 2015) ("[A] prosecutor is free to suggest during oral argument what the jury should conclude from the evidence before it."). Here, a central defense claim was that the defendants were acting independently, and it was therefore appropriate for the prosecutor to compare how the defendants themselves described their relationship

37

with Ionov with the agreed-upon instruction explaining to the jury what a conspiracy is. *See Reeves*, 742 F.3d at 505-06 (concluding that comments "were not improper because the government was merely drawing conclusions from the trial evidence").

## C. The Jury Was Correctly Instructed Regarding *Mens Rea*

The defendants next argue that the district court erred in describing the *mens rea* required for a conspiracy to violate Section 951. They claim that "they could not be convicted on the conspiracy charge without evidence that they knew of § 951's registration requirement." Br. 32; Romain Br. 34. The district court rejected this argument, relying on this Court's prior holding that "Section 951 does not require actual notice or knowledge of the notification requirement." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010) (capitalization altered). The *Duran* Court further noted "the longstanding and uniformly recognized rule that the conspiracy statute does not impose its scienter requirement upon the general intent offense that is the object of the conspiracy." *Id.* at 1296 (citing *United States v. Feola*, 420 U.S. 671, 686-87 (1975)). Thus, a conspiracy charge also does not require proof that a defendant had knowledge of Section 951's notification

38

requirement. *Id.* For the reasons explained in this Court's prior cases, the Court should reject the defendants' attempt to add an additional *mens rea* requirement to the conspiracy charge of which they were convicted.

    1.  <u>The Law of the Circuit Forecloses the Defendants'<br>Interpretation of Section 951</u>

This Court first addressed Section 951's *mens rea* requirement in *United States v. Campa,* 529 F.3d 980 (11th Cir. 2008). There, the Court noted that Section 951 "is silent about *mens rea*," and "[w]here no specific intent element is apparent on the face of the statute, the crime is one of general intent." *Id.* at 999 (quoting *United States v. Ettinger,* 344 F.3d 1149, 1158 (11th Cir. 2003)). Furthermore, "[a] defendant need not intend to violate the law to commit a general intent crime, but he must actually intend to do the act that the law proscribes." *Id.* (quoting *United States v. Phillips*, 19 F.3d 1565, 1576-77 (11th Cir. 1994)). In holding that Section 951 does not require proof of knowledge of the notification requirement, the Court explicitly noted that it was "join[ing] the Seventh Circuit," which had reached the same conclusion. *Id.* (citing *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005)).

39

Having settled the statutory interpretation question in *Campa*, this Court in *Duran* examined whether the lack of a specific intent element rendered the statute unconstitutionally vague. *See* 596 F.3d at 1290. Along the way to rejecting this claim, the Court reaffirmed that, as a general intent crime, "Section 951 does not require actual notice or knowledge of the notification requirement." *Id.* at 1292 (capitalization altered). The Court then concluded that, as applied to Duran's conduct, the statute was not unconstitutionally vague. *Id.* at 1295.

This Court is "bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court." *United States v. White*, 837 F.3d 1225, 1228 (11th Cir. 2016) (internal quotation marks omitted). The Supreme Court's decisions in *Rehaif v. United States*, 588 U.S. 225 (2019), and *Ruan v. United States*, 597 U.S. 450 (2022), have not abrogated *Duran*, contrary to the defendants' claim. *See* Br. 34-35; Romain Br. 36. Neither case altered the settled tools of statutory interpretation that this Court applied in *Campa* and *Duran*. Rather, *Rehaif* and *Ruan* addressed statutes that, unlike Section 951, include an explicit *mens rea* requirement and noted that "when Congress includes a general scienter provision in the statute,"

40

there is a presumption that the requirement applies to all elements. *See*

*Rehaif*, 588 U.S. at 229-30 (applying the "knowingly" *mens rea* in 18

U.S.C. § 924(a)(2) to other elements); *Ruan*, 597 U.S. at 457-60

(applying the "knowingly or intentionally" *mens rea* from 21 U.S.C.

§ 841 to other elements). These cases did not upset the bedrock

principle that "ignorance of the law or a mistake of law is no defense to

criminal prosecution." *Duran*, 596 U.S. at 1290 (quoting *Cheek v. United*

*States*, 498 U.S. 192, 199 (1991)). That principle, and the standard tools

of statutory interpretation applied in *Duran*, remain the same today,

and *Duran*'s holding remains the law of this Circuit. *See White*, 837

F.3d at 1230-31 ("Binding circuit precedent can only be overruled by a

Supreme Court decision that is clearly on point[;]" it "must actually

abrogate or directly conflict with, as opposed to merely weaken, the

prior panel's holding") (internal quotation marks omitted).

> 2. <u>Section 951 Must Be Given a Consistent Interpretation</u>

In addition to claiming that *Duran* has been abrogated, the

defendants also assert that "*Duran* does not control this case" because

they claim their "conduct was innocent absent the registration

requirement." Br. 35; Romain Br. 36-37. This claim confuses the

question of statutory interpretation that the defendants raise here—

whether a conviction pursuant to Section 951 requires a showing that

the defendant had knowledge of the notification requirement—with the

constitutional question addressed in *Duran*—whether Section 951 was

unconstitutionally vague as applied. Thus, while the defendants

attempt to re-hash the same claims rejected in *Duran*, these flawed

arguments have no bearing on whether the jury was properly instructed

about Section 951's elements.

First, both Duran and the defendants here cited the Supreme

Court's holding in *Lambert v. California*, 355 U.S. 225 (1957), that a

city code requiring all convicted felons who remain in the city for more

than five days to register was unconstitutional absent knowledge of the

requirement. *See Duran*, 596 F.3d at 1292-93; Br. 33-34; Romain Br. 35.

But the *Duran* Court explained why this comparison was flawed:

Unlike the city code, Section 951 "requires the affirmative action and

conduct of the defendant." 596 F.3d at 1293. "[T]he *Lambert* Court

distinguished between misfeasance and nonfeasance, and here, Duran

engaged in misfeasance by 'acting' as an agent of a foreign government

42

without notifying the Attorney General before doing so." *Id.* at 1292-93. The same holds true of the defendants here.

Second, "Duran argue[d] that in order to have sufficient notice of the notification requirement, his conduct must also have necessarily involved an intent to engage in espionage or traditional notions of spying and subversive activity." *Id.* at 1293. The defendants here likewise claim that their "conduct was innocent absent the registration requirement." Br. 35; Romain Br. 36-37. However, as this Court explained, "the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful." *Duran*, 596 F.3d at 1293. Rather, "Congress chose to separate § 951 and treat it as a catch-all statute that would cover *all* conduct taken on behalf of a foreign government." *Id.* at 1295 (emphasis added).

To the extent the defendants claim that *Duran*'s conclusions regarding statutory interpretation do not apply here or to "completely

43

innocent conduct" generally, this Court should reject the argument.[5]

Section 951, like all statutes, must be given a single, consistent interpretation; its elements cannot change depending on a particular defendant's conduct. *Cf. Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[W]e must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context."). This interpretation must apply across the "plethora of possibilities under which those engaged in purportedly legal conduct on behalf of a foreign government could be convicted if an agent of a foreign government fails to notify the Attorney General of such conduct." *Duran*, 596 F.3d at 1295. Thus, the holdings of *Campa* and *Duran*—that Section 951 is a general intent statute and does not require proof of knowledge of the notification requirements—govern this case.

---

[5] The constitutional question reserved in *Duran* is not presented here. *See* 596 F.3d at 1296 n.9 (declining to "express an opinion as to the constitutionality of possible applications of § 951 to completely innocent conduct"). Procedurally, the defendants have not raised any due process challenge. And substantively, the defendants are wrong in claiming their conduct was "completely innocent." Rather, their conspiratorial agreement contemplated spreading Russian propaganda, while hiding the relevant fact that Russia was utilizing them, and providing them funding, to act as "forces inside the U.S. to sow division inside the U.S." 5A:997-98.

44

### D.    The Jury Was Correctly Instructed Regarding the Scope of the Conspiracy

Finally, Yeshitela, Hess, and Nevel argue that the district court abused its discretion in denying their proposed instruction that would have "prevent[ed] the jury from considering the evidence offered against Romain in their case." *See* Br. 39. This Court

> consider[s] three factors when determining whether the district court's refusal to give a requested jury instruction warrants reversal: (1) whether the requested instruction is a substantially correct statement of the law; (2) whether the jury charge given addressed the requested instruction; and (3) whether the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense.

*United States v. Hill*, 799 F.3d 1318, 1320 (11th Cir. 2015) (internal quotation marks omitted). These defendants' proposed instruction fails all three prongs of the test.

First, the requested instruction was not a correct statement of the law. All four defendants were charged with participating in a single conspiracy. *See* 1A:53. This single conspiracy charge provided the "legal basis for the jury to consider evidence of Romain's actions," Br. 40, even after he left APSP. The jury concluded that the charged conspiracy existed, and "a jury's conclusion that a single conspiracy existed should

45

not be disturbed as long as it is supported by the evidence." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). In particular, "a jury may find that a single conspiracy existed when a 'key man' directs and coordinates the activities and individual efforts of various combinations of people." *Id.* at 1284-85 (internal quotation marks omitted). In this case, Ionov played such a role, and a review of the "common goal" of the participants, "the nature of the underlying scheme," and "the overlap of participants," *id.* at 1284, confirms that these defendants' implicit challenge to the jury verdict should be rejected. And because such a single conspiracy was charged and proven, the defendants' proposed instruction was not a correct statement of the law. *See Baston*, 818 F.3d at 663 (A district court is "under no obligation to give a requested instruction that misstates the law.") (internal quotation marks omitted).

Taken as a whole, the jury instructions properly focused the jury on the need to find a single conspiracy. The jury was instructed that:

> You must decide whether the single overall conspiracy charged existed between two or more conspirators. If not, then you must find the defendants not guilty of that charge, but if you decide that a single overall conspiracy did exist, then you must decide who the conspirators were. And if you

46

decide that a particular defendant was a member of some other conspiracy, not the one charged, then you must find that defendant not guilty. So to find a defendant guilty, you must all agree that the defendant was a member of the conspiracy charged, not a member of some other separate conspiracy.

8A:1509-10. The instructions also properly addressed the potential for prejudicial spillover among the defendants, explaining to the jury:

[Y]ou must consider the case of each defendant separately and individually. If you find a defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime or any other defendant.

8A:1516-17. And, at the defendants' request, 8A:1326-27, the jury was instructed to consider whether a defendant had withdrawn from the conspiracy at some point. *See* 8A:1510. Together, these instructions appropriately guarded against the possibility that evidence solely of "Romain's actions . . . was a likely cause of" the other defendants' convictions. *See* Br. 40-41. In fact, the jury was closely attuned to the need to consider each defendant's culpability, asking the district court during deliberations about the potential need to also evaluate the guilt of the co-conspirators who did not appear at the trial. *See* 8A:1540-44.

Third, these defendants have not claimed that the lack of an instruction hindered their defense. In fact, these defendants highlighted

47

Romain's separation from APSP during the later years of the conspiracy. *See, e.g.*, 12A:2216 (defense cross-examination). And, as noted above, they asked that the jury be instructed on the requirements for withdrawal from a conspiracy. *See* 8A:1326-27. The jury rejected their attempts to separate themselves from Romain's actions, but that is not a sign that their defense was "seriously impaired," *Hill*, 799 F.3d at 1320. It merely shows the strength of the government's evidence.

The sole case on which these defendants rely, *United States v. Gonzalez*, 975 F.2d 1514 (11th Cir. 1992), is distinguishable on each of these three factors. In *Gonzalez*, the district court denied a defendant's request for an instruction that the jury could only convict the defendant of violating 18 U.S.C. § 1956 based on the charged transactions, rather than other transactions that had been introduced with respect to a conspiracy count. The requested instruction in *Gonzalez* was a correct statement of law because the substantive offense was more limited than the charged conspiracy. But here, the defendants are challenging the instructions regarding the broader conspiracy, not the substantive offense. Their proposed instruction was therefore incorrect as a matter of law. Second, while the district court in *Gonzalez* "failed to give an

48

instruction that was substantially similar," *id.* at 1517, here the district court correctly instructed the jury about the need to consider the defendants individually. And finally, unlike in *Gonzalez*, the instructions here explained that the government was required to prove "beyond a reasonable doubt . . . every essential element of the crime." *Id.* This Court should reject the defendants' challenge to the jury instructions.

## III.  THE FIRST AMENDMENT DOES NOT IMMUNIZE THE DEFENDANTS' CRIMINAL CONSPIRACY

The defendants' first argument on appeal is the startling claim that the First Amendment permitted them to secretly act in the United States as Russian agents, so long as those acts could be framed as "speech." *See* Br. 18-24; Romain Br. 20-26. They further claim that the government here has "criminalize[d] lawful political speech." Br. 21; Romain Br. 23. Neither claim is correct. Initially, because the defendants were not convicted of violating Section 951, their focus on the First Amendment's applicability to the actions that resulted from their conspiracy is misplaced. But even if the Court were to address

49

their broader claims, it should hold that 18 U.S.C. § 951, as applied here, does not violate the First Amendment.

## A. The First Amendment's Applicability to Certain Overt Acts Is Irrelevant

As explained above, *see supra* Part II.A, the defendants labor under the misimpression that the jury would have needed "to find the elements of the [Section] 951 violation to find the conspiracy." *See* Br. 36; Romain Br. 38. This false premise underlies much of their sufficiency-of-the-evidence challenge, but it also underlies their First Amendment arguments. As previously noted, "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton*, 328 U.S. at 643. "The government does not need to prove that the defendants accomplished the purpose of the conspiracy" in order to sustain a conspiracy conviction. *Campa*, 529 F.3d at 1002. As a result, whether the First Amendment immunized the defendants' violation of Section 951 (it did not) has little bearing on whether they were properly convicted of a criminal conspiracy.

To the extent the defendants are asserting that the First Amendment also prohibits their conspiracy conviction, the Court should

50

reject that claim. The First Amendment has never barred the "[m]any long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—[that] criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *United States v. Williams*, 553 U.S. 285, 298 (2008). The defendants do not and cannot assert any First Amendment right to criminally conspire, nor do they claim that their interactions with Ionov and AGMR were constitutionally protected.

To be sure, many of the acts that they claim are constitutionally protected were alleged to be overt acts in furtherance of the conspiracy. *See* 1A:57-79. But an overt act "can be innocent in nature, provided it furthers the purpose of the conspiracy." *Campa*, 529 F.3d at 1002 (quoting *Iannelli v. United States*, 420 U.S. 770, 786 n.17 (1975)); *see also Yates v. United States*, 354 U.S. 298, 334 (1957) (permitting on remand evidence of overt acts consisting of speeches at two public meetings), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978). Furthermore, several overt acts were not constitutionally protected, such as Ionov's reports to his Russian handlers, 1A:69, 73, and "[a]n individual conspirator need not participate in the overt act in

51

furtherance of the conspiracy" to be convicted. *United States v. Isaacson*, 752 F.3d 1291, 1303 (11th Cir. 2014) (internal quotation marks omitted). Thus, for the same reason the Court does not need to address the defendants' claims about the scope of the terms "direction" and "control" in Section 951, it also does not need to address the First Amendment's applicability to the charged overt acts.

But the defendants' quarrels with the charged overt acts are the entirety of their First Amendment argument. *See* Br. 20 (discussing only "the utterances charged"); 18-24; Romain Br. 22 (same). They have notably not claimed that their conspiratorial agreement was limited to only First Amendment conduct. The evidence, viewed in the light most favorable to the government, confirms that there was no such limitation. *See generally supra* Part I. Thus, the Court should affirm the defendants' convictions on the basis that the First Amendment does not protect their criminal conspiracy.

## B. Section 951 Does Not Violate the First Amendment

On the merits, the defendants' First Amendment claim fails because, to the extent that Section 951 regulates speech at all, it satisfies intermediate scrutiny. This conclusion flows both from first

principles and from the Supreme Court's analysis of a closely analogous statute in *Meese v. Keene*, 481 U.S. 465 (1987). The defendants, however, address neither. This Court reviews *de novo* "whether the application of the statute . . . at issue was constitutional." *United States v. Corrigan*, 144 F.3d 763, 768 n.4 (11th Cir. 1998).

Beginning from first principles, "a content-neutral regulation of expressive conduct is subject to intermediate scrutiny, while a regulation based on the content of the expression must withstand the additional rigors of strict scrutiny." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021). The defendants do not dispute that Section 951 is content neutral. *See* Br. 21 & n.7; Romain Br. 23 & n.3. Indeed, the statute applies equally to those who, as an agent of a foreign government, act to sow division or to bring Americans together, to those who oppose or support Russian participation in the Olympics, and to those who oppose or support Russia's invasion of Ukraine. Section 951 is therefore constitutional so long as it "is narrowly drawn to further a substantial governmental interest . . . unrelated to the suppression of free speech." *Food Not Bombs*, 11 F.4th at 1291 (internal quotation marks omitted).

53

The defendants assert that "content neutral laws will be considered content-based when used by the government to target speech." *See* Br. 21 (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)); Romain Br. 23-24 (same). But the circumstances that *Reed* described—"laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys," 576 U.S. at 164 (citation modified)—are not present here. Section 951 is justified by the need to prevent foreign actors from surreptitiously acting in America, regardless of the content of those actions. And in this appeal the defendants have not even alleged that they were somehow singled out because of the content of their messages, rather than because they were acting as undisclosed agents of Russia. Intermediate scrutiny therefore remains appropriate.

Section 951 easily survives intermediate scrutiny.[6] First, the statute furthers a substantial government interest: As *Duran*

[6] The defendants err in reading the district court's holding that their speech "r[o]se to the level of 'acts' within the meaning of Section 951," 1A:207, as a holding that certain speech "loses its protection (continued . . .)

54

recognized, "the Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States, whether the action is legal or not." *Duran*, 596 F.3d at 1295. The defendants' claim that this case does not "present any legitimate national security concerns," Br. 20; Romain Br. 22, is both factually wrong and beside the point. As Professor Rid explained, Russian "active measures" are specifically designed "to turn a society against itself and to make it weaker in the process." 6A:1129. They therefore strike at core national security interests. And, as *Duran* recognized, Section 951's interests are broader than the defendants' narrow conceptions of national security. *See Duran*, 596 F.3d at 1294-95 (noting that "[a]lthough Congress' original intent in 1917 was national security, defense, and targeting espionage and subversive acts," Section 951 was later enacted to act "as a catch-all statute that would cover all conduct taken on behalf of a foreign government").

---

under the First Amendment." *See* Br. 18; Romain Br. 20. If this were so, the district court would not have needed to subject Section 951 to intermediate scrutiny. The fact that the court performed this analysis, 1A:213-218, confirms that the court correctly understood that the First Amendment remained relevant in analyzing the defendants' acts as Russian agents.

Furthermore, the statute is narrowly tailored to avoid unnecessarily burdening speech, just as the district court concluded. *See* 1A:217-18. As drafted, Section 951 does not prohibit *any* speech on *any* topic, provided one satisfies the minimal notification requirements. *See* 28 C.F.R. § 73.6. Section 951 is therefore fully consistent with the First Amendment.

The Supreme Court's analysis in *Meese* confirms this conclusion. There, the Court addressed an individual's desire to exhibit certain films addressing acid rain and nuclear war. *See* 481 U.S. at 468. Because those films were produced by Canada, the Foreign Agents Registration Act (FARA) required that they be labeled as such and that the individual register with the government. *Id.* In analyzing whether this violated the First Amendment, the Supreme Court first noted that, like Section 951, FARA "neither prohibits nor censors the dissemination of advocacy materials by agents of foreign principals." *Id.* at 478.

FARA, again like Section 951, instead adopted a narrowly tailored approach. It "simply required the disseminators of such material to make additional disclosures that would better enable the public to evaluate the import of the propaganda." *Id.* at 480. In "the absence of

any direct abridgment of speech," there was no First Amendment problem with requiring compliance with FARA's labeling and registration requirements. *Id.* at 482; *see also Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 935 & n.23 (D.C. Cir. 1982) (collecting cases and noting "it is well settled that FARA is constitutional"). The same is true of Section 951.[7] *See Dumeisi*, 424 F.3d at 579 (finding that, in a Section 951 prosecution, the First Amendment permitted proof that the defendant published articles at the behest of a foreign government).

The Supreme Court's analysis in *Meese* also confirms that the defendants are misguided in relying on *De Jonge v. Oregon*, 299 U.S. 353 (1937), and *Cohen v. California*, 403 U.S. 15 (1971). Both cases pre-date *Meese*, and yet the Supreme Court relied on neither in holding that FARA's application to the Canadian videos was constitutional. This makes sense because both *De Jonge* and *Cohen* involved direct prohibitions on speech, while FARA and Section 951 permit all speech

---

[7] The differences between FARA and Section 951 do not alter the analysis. FARA applies to a different set of "agents" than Section 951. *Compare* 22 U.S.C. § 611(c) *with* 18 U.S.C. § 951(d). FARA also requires "registration" rather than "notification." *Compare* 28 C.F.R. § 5.200 *with* 28 C.F.R. § 73.6. Both statutes provide criminal penalties for failure to comply. *See* 22 U.S.C. § 618(a).

so long as their registration or notification requirements are met. *De Jonge*, *Cohen*, and other cases applying strict scrutiny principles do not alter the conclusion that Section 951 is fully consistent with the First Amendment.

## IV. THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR IN ADDRESSING TESTIMONY ABOUT A POTENTIAL DOXING WEBSITE

In the final two pages of their brief, Yeshitela, Hess, and Nevel levy an opaque claim of prosecutorial misconduct. *See* Br. 41-42. They claim that somewhere within two question-and-answer pairs from the re-direct examination of Special Agent Bowen, the prosecutor made "a false and inflammatory claim." *See id.* While the court "typically" reviews "a claim of prosecutorial misconduct de novo," "when, as here, the defendant does not object at trial or otherwise raise the issue before the district court," the Court will "review only for plain error." *United States v. Al Jaberi*, 97 F.4th 1310, 1322 (11th Cir. 2024) (cleaned up). "Reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the

58

entire atmosphere of the trial." *Id.* (internal quotation marks omitted).

Here, no misconduct occurred, and the district court did not plainly err.[8]

The prosecutors' questions referred to a January 15, 2016 meeting of APSP members to discuss "proposals from AGM-Russia." *See* 13A:2323. The government had previously introduced, without objection, Yeshitela's summary of this meeting, which described:

> 1. Website documenting what the cops do [to] Africans everywhere. Features should include ability of anyone throughout the U.S. to post this on our site. Picture, names, addresses about the cops. Need the design. Could raise the prestige of inPDUM since we are in a contest with the FBI. We would have our own site.

13A:2323-24. The meeting notes then went on to describe the "tent city" discussed above, as noted in the summary exhibit regarding the tent encampment. *See* 13A:2322. During its cross-examination of Special

---

[8] Although the defendants focus their claim on the prosecutor's questions, *see* Br. 41 ("the prosecutor . . . false accuse[d] the defendants"), they may be attempting to raise a *Napue* claim. This would require "show[ing] the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010). Such a claim would also fail. As discussed in the text, neither the prosecutor's questions nor the witness's answers were false. Moreover, the defendants have not even argued that the testimony at issue was material.

Agent Bowen, the defense introduced the audio recording of this meeting and asked questions about certain statements by the defendants during that meeting. *See* 12A:2192-96.

On re-direct examination, the prosecutor asked about the portion of the audio recording discussing the website described above. After the witness explained that "[d]oxing is when someone puts personal information about another individual online so that—like their address, name and address, something like that," the prosecutor then asked, again without objection:

> Q. And in that meeting, did they discuss a plan to work on a doxing website with the Russians?
>
> A. Yes.

12A:2258. The government then played the relevant portion of the audio recording of the meeting. 12A:2259.[9] After doing so, the following exchange occurred:

> Q. And so when Omali Yeshitela says that they're going to build -- that they have support to build a website to publish the personal information of police officers, judges, and prosecutors, whose support is he referring to?

---

[9] An unofficial transcript of the recording is reproduced at 5A:788-843. The government played portions transcribed at 5A:789-90.

60

MS. GRIFFIN: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: He is referring to AGMR support.

12A:2260. No further mention of the website occurred until defense counsel raised it in his closing argument. *See* 8A:1434.

There was no false claim in the cited testimony. As both the written summary and audio recording show, and the witness confirmed, the meeting did in fact include discussion of "a plan to work on a doxing website with the Russians." Likewise, the defendants in fact had "support to build a website to publish the personal information of police officers, judges, and prosecutors." The defendants argue (Br. 42) that the website was never built, but neither the prosecutor's questions nor the witness's responses indicated that it had been built. To be sure, the prosecutor initially framed his question as about a plan "that they're going to build" such a website, but he immediately switched to more precise language. Moreover, such a forward-looking statement was also consistent with the fact that they had a plan to build the website even if that plan never came to fruition.

61

The Court should only review these defendants' claim that these questions warrant reversal of their convictions for plain error. While the defense repeatedly objected to the phrasing of the prosecutor's questions on this subject, *see* 12A:2259-60, those objections were resolved, and the defense never claimed misconduct during the trial or requested a curative instruction. The decision to wait to raise such a claim until their post-trial motions, *see* 5A:776-80, means that to succeed, the defendants' claim must satisfy the rigorous plain error standard. *See United States v. Margarita Garcia*, 906 F.3d 1255, 1269 (11th Cir. 2018) (concluding that plain error review applied where objection "came too late to allow the district court to correct the error and avert an unnecessary retrial" (internal quotation marks omitted)).

The defendants cannot meet any of the four prongs of the plain error test, let alone all of them. *See Al Jaberi*, 97 F.4th at 1322 ("To establish plain error, a defendant must show (1) error; (2) that is plain; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.") (internal quotation marks omitted). As explained above, there was no error, as the prosecutor's questions were consistent with the evidence

62

that the defendants were in fact offered Russian support to build a doxing website. Moreover, the jury was instructed that "[a]nything the lawyers say is not evidence," 8A:1502, and the defendants have not claimed that any of the witness's answers were false. *See Al Jaberi*, 97 F.4th at 1328 (finding no error after similar instruction). Nor was any such error plain, but rather appears to hinge at most on subtle distinctions in the phrasing of the questions. Finally, when "viewed in the context of the trial as a whole," *id.*, these isolated questions did not affect the defendants' substantial rights or seriously affect the fairness of the trial. Indeed, the government never mentioned the planned website again, even after defense counsel highlighted the issue during closing arguments. *See* 8A:1434. Accordingly, this Court should reject these defendants' claim of prosecutorial misconduct.

63

# CONCLUSION

This Court should affirm the defendants' convictions.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney
for the Middle District
of Florida

JOHN A. EISENBERG
Assistant Attorney General for
National Security

/s/ Joseph P. Minta
JOSEPH P. MINTA
Appellate Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel.: 202-353-9055
joseph.minta@usdoj.gov

*Attorneys for the United States*

Dated: December 1, 2025

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the 13,000-word limit of Fed. R. App. 32(a)(7) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,067 words.

I further certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

<u>/s/ Joseph P. Minta</u>
Joseph P. Minta
Attorney for the United States

65